# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA

**TED MARIO BLACKMON, et al.**                    **CIVIL ACTION**

**VERSUS**                                         **NO. 18-142-BAJ-SDJ**

**BRACKEN CONSTRUCTION
COMPANY, INC., et al.**

## ORDER RESOLVING BRIEFED DISCOVERY ISSUES AND
## CHARTER OAK'S MOTION TO COMPEL

At the parties' request, the Court ordered briefing on several discovery issues addressed during a September 9, 2019 Status Conference. (R. Doc. 198). Both sides submitted Briefs (R Docs. 204, 205) and Responses (R. Docs. 206, 207). There are 2 main issues briefed by the parties: (1) the sequencing of depositions; and (2) the waiver of attorney-client privilege as to Plaintiffs' former counsel. Shortly after the parties' Briefs were submitted, Charter Oak filed a Motion to Compel (R. Doc. 210) Plaintiffs' complete responses to its written discovery requests. Because certain issues in Charter Oak's Motion to Compel (R. Doc. 210) overlap with those presented in the parties' Briefs (R. Docs. 204, 205), the Court resolves all three filings below. (R. Docs. 204, 205, 210).

## I.    FACTUAL BACKGROUND

In 2016, Jhon Jaramillo was a dual employee of 2 related companies, C3 Construction Services, Inc., and Bracken Construction. (R. Doc. 79 at 5). On June 15, 2016, Jhon Jaramillo drove a Ford F350 owned by C3 from Mississippi to Alabama, while in the course and scope of his employment with Bracken Construction. (R. Doc. 79 at 7). Near Mobile, Alabama, Jaramillo

caused a head-on collision while attempting to pass the car in front of him. (R. Doc. 79-1).
Jaramillo collided head on with a vehicle driven by Ted Blackmon, killing Blackmon's 2
passengers—his long-time girlfriend, Shemika Robinson, and their 2-year-old son, Khance
Blackmon. (R. Doc. 79-2 at 7). The driver of the car Jaramillo attempted to pass, Russell Koop,
was also injured. (R. Doc. 79-1 at 3).

C3 carried a $1 million auto policy issued by Charter Oak Fire Insurance Company
(Charter Oak). (R. Doc. 79-3). Bracken Construction carried a $1 million liability policy issued by
Travelers Property Casualty Company (Travelers Property), and a $10 million excess policy issued
by Travelers Excess and Surplus Lines Company (Travelers Excess). (R. Doc. 79 at 22).

Anthony Ver Meer was assigned by Charter Oak to adjust the claim under the $1 million
policy issued on behalf of C3 Construction. He contacted the victims of the accident in July of
2016, informing them of C3's Policy and its $1 million limit. (R. Doc. 79-3). In August of 2016,
Ver Meer realized that Jaramillo was likely in the course and scope of his employment with
Bracken at the time of the accident, making the additional $11 million in coverage under Bracken's
Policies potentially available. According to Ver Meer, he notified Ted Blackmon, Shemika
Robinson's mother, and Russell Koop's attorney, by certified letter on August 23, 2016. (R. Doc.
182 at 4).

The letter identified and included contact information for both Matt Willson, the adjuster
for Travelers who would be handling the claim, and James Holland, the attorney for Bracken. (R.
Doc. 88-6).

Ted Blackmon claims he never got the August 23, 2016 letter and that he and his mother,
Ruthie Blackmon, the representative of Khance's estate, were fraudulently induced into settling
Khance's wrongful death claim for well below what it was worth—$650,000.00—on October 19,

2017. (R. Doc. 79 at 18, 26, 28); (R. Doc. 88-18). Ver Meer claims he had multiple discussions with Ted Blackmon about the additional coverage, but that Mr. Blackmon was having financial trouble, making him desperate for a quick settlement. (R. Doc. 182 at 4-6). Matt Willson also claims that Mr. Blackmon called him on his direct line after receiving the letter and that he had multiple phone calls with Blackmon about the additional coverage available under the Bracken policies. (R. Doc. 145-2). Defendants later obtained Mr. Blackmon's phone records, which indicate that calls were placed to both Matt Willson and James Holland (Bracken's attorney) on September 2, 2016. (R. Doc. 258 at 2-3); (R. Doc. 258-6) (Ted Blackmon's phone records); (R. Doc. 258-8) (Holland's phone records).

On January 11, 2018, Ted and Ruthie Blackmon filed this lawsuit against Bracken Construction Company, C3 Construction Services, Jhon Jaramillo, the Charter Oak Fire Insurance Company, Travelers Property Casualty Company of America and Travelers Excess and Surplus Lines Company. Relevant here, Ted and Ruthie Blackmon claim Defendants fraudulently induced them into settling the claims of both Ted Blackmon and the estate of Khance Blackmon and are liable for: insurance bad faith and unfair settlement practices under the laws of Louisiana and Florida; equitable estoppel; unjust enrichment; detrimental reliance and promissory estoppel; and "failure/lack of cause and/or consideration." (R. Doc. 79). Plaintiffs also seek rescission of both settlement agreements due to error or mistake of fact. (R. Doc. 79).

This case has a convoluted procedural history, which includes a year-long stay of discovery (R. Docs. 41, 66, 139) (staying discovery from April 19, 2018, until April 8, 2019) and a now dismissed, but related, proceeding in Florida aimed at rescinding the settlement agreements at issue here. The stay of discovery was eventually lifted on April 8, 2019. (R. Doc. 139). Unfortunately, little discovery has been accomplished since then. This is in part due to the case being reassigned

by the Court in February of 2020. But in large part, the lack of progress in discovery results from a perceived breakdown in counsel's working relationship, which has impeded cooperation and equanimity throughout discovery. For this reason, there are currently 11 discovery-related Motions pending before the Court (R. Docs. 204, 205, 210, 213, 237, 244, 252, 253, 254, 255, 256). The issues presented in those filings will be considered by the Court in this and subsequent Orders. This first Order takes up the issues in the discovery-related Briefs (R. Docs. 204, 205) filed by each side, as well as Charter Oak's Motion to Compel (R. Doc. 210), as these filings present overlapping issues.

### A.    Discovery Issues Briefed by the Parties (R. Docs. 204, 205)

The parties contacted the Court in September of 2019, requesting a Status Conference to discuss several discovery-related issues. Following the September 9, 2019 Status Conference, the Court ordered briefing from the parties (R. Doc. 198), and both sides complied. (Defs.' Brief, R. Doc. 204); (Pls.' Opp'n, R. Doc. 207); (Pls.' Brief, R. Doc. 205) (Defs.' Opp'n, R. Doc. 206).

There are 2 main issues briefed by the parties: (1) the sequencing of depositions; and (2) "potential assertions of privilege connected to any depositions" of Austin Ward and Scott Barnes, Ted Blackmon's former counsel in Florida, who briefly represented him in connection with the settlement of Khance Blackmon's wrongful death claim, as well as Nick Medley, also an attorney in Florida, who represented the Blackmons in opening the estate of Khance Blackmon prior to settlement. (R. Doc. 198 at 2). More specifically, Defendants want to ask the Blackmons' former counsel about: (1) when and how Plaintiffs learned of the additional $11 million in coverage potentially available under the Bracken Policies; (2) Ted Blackmon's reasons for disengaging his former counsel, Austin Ward and Scott Barnes; and (3) Ted Blackmon's attempts to secure loans against his anticipated settlement. (R. Doc. 204 at 14-20).

### B.    Charter Oak's Motion to Compel

Shortly after the parties filed their Briefs, Charter Oak moved to compel Plaintiffs' responses to certain discovery requests. (R. Doc. 210). Among the discovery at issue is Plaintiffs' refusal to provide certain information based on privilege—either attorney-client privilege, work product protection, or simply claiming privacy. Specifically, Plaintiffs have withheld information about: (1) when and how they first learned of the Bracken Policies, (2) Ted Blackmon's disengagement of Ward and Barnes, and (3) Ted Blackmon's attempt to secure a settlement loan. In other words, the same privilege issues presented in the parties' Briefs. (R. Docs. 204 and 205). Because of these overlapping issues, the Court considers all 3 filings below: Plaintiffs' Discovery Brief (R. Doc. 205), Defendants' Discovery Brief (R. Doc. 204), and Charter Oak's Motion to Compel (R. Doc. 210).

## II.    LEGAL STANDARD

Rule 26(b)(1) of the Federal Rules of Civil Procedure permits discovery of "any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering," among other things, "the importance of the discovery in resolving the issues, and whether the burden or expense . . . outweighs its likely benefit." In terms of relevance, "information within this scope of discovery need not be admissible in evidence to be discoverable." Fed. R. Civ. P. 26(b)(1). The scope of discovery is not without limits, however, and the court may protect a party from responding to discovery that is unreasonable or outside the scope permitted by Rule 26(b)(1). *See* Fed. R. Civ. P. 26(b)(2). A party may also withhold information that would be otherwise discoverable on the basis of privilege, Fed. R. Civ. P. 26(b)(1), but it must expressly make the claim and describe the nature of the document being withheld, Fed. R. Civ. P. 26(b)(5).

The rules governing discovery are accorded broad and liberal treatment to achieve their purpose of adequately informing litigants in civil trials. *Hebert v. Lando*, 441 U.S. 153, 176 (1979). But ultimately, the scope of discovery is within the sound discretion of the trial court. *E.g.*, *Quintero v. Klaveness Ship Lines*, 914 F.2d 717, 724 (5th Cir. 1990) ("the district court has wide discretion in determining the scope and effect of discovery").

## III.    DISCUSSION

The Court will first consider the sequencing of depositions, an issue raised by both sides in their Briefs (R. Docs. 204, 205), before turning the privilege issues presented in both the Briefs and Charter Oak's Motion to Compel, followed by the remaining discovery at issue in Charter Oak's Motion (R. Doc. 210).

### A.    Sequencing of Depositions

The parties have been unable to resolve a dispute that has stymied discovery for well over a year—which side gets to depose the other first.

During a status conference in May of 2020, the Court expressed concern that the parties' main fight seems to be over who requested depositions first and that a showing of good cause— i.e., an explanation of why the facts and circumstances of this particular case warrant a particular side being deposed first—appeared to be more of an afterthought. While the parties disagreed with the Court's characterization, their Briefs make clear that the main fight is over who requested depositions first, as the parties believe the first side to ask, wins.

The Court will not recount each side's representations as to the superior timing and legitimacy of its deposition requests. That information is irrelevant, as the 'priority rule' relied on by the parties—i.e., the first to ask, wins—no longer controls the sequencing of depositions in federal court. And it hasn't been around for quite some time.

Indeed, the advisory committee notes from 1970—50 years ago—clearly indicate that the priority rule is no longer recognized following the addition of Rule 26(d). *See* Fed. R. Civ. P. 26(d) advisory committee's note (1970) (The principal effects of the new provision are first, to eliminate any fixed priority in the sequence of discovery" and noting the "priority rule developed by some courts, which confers priority on the party who first serves notice of taking a deposition, is unsatisfactory in several important respects."); *United States v. Bartesch*, 110 F.R.D. 128, 129 (N.D. Ill. 1986) ("Therefore, it is clear that the priority rule, which confers priority on the party who first serves notice of taking a deposition, is abolished by Rule 26(d).").

Instead, Rule 26(d)(3) puts no limits on the sequencing of discovery. However, the Court may order that discovery proceed in a particular sequence "for the parties' and witnesses' convenience and in the interest of justice . . . ." Fed. R. Civ. P. 26(b)(3); *see also Meisenheimer v. DAC Vision Inc*., 2019 WL 6619198, at *3 (N.D. Tex. Dec. 4, 2019) ("DAC must show good cause . . . and it cannot do so by invoking [a] non-existent he-who-serves-the-first-notice-can-dictate-the-order-of-depositions . . . rule[]."). Nonetheless, courts do not regularly issue orders altering the sequence of depositions unless a specific reason justifies taking one party's deposition before other depositions commence. *Stein v. TriCity Healthcare Dist*., 2014 WL 458021, at *2 (S.D. Cal. Feb. 4, 2014) (citation omitted).

Here, neither party has done much to show good cause or otherwise explain why the particular facts and circumstances of this litigation warrant a particular sequencing of depositions. Plaintiffs' position is almost entirely based on the "non-existent" priority rule (R. Doc. 205 at 1-4). *Meisenheimer*, 2019 WL 6619198, at *3 (describing the priority rule as "non-existent"). And while Defendants present an alternative argument, they largely rely on a concept that "fundamental fairness dictates that the parties who initiated this litigation and bear the burden of proof should

submit to depositions first," (R. Doc. 204 at 8-12), which carries little weight. *Meisenheimer*, 2019 WL 6619198, at *4 ("DAC's arguments for good cause do not rely on facts particular to this case . . . . Rather DAC relies on general customs or standards that it holds out as rules – but that are not rules and . . . do not automatically provide good cause in every case to require a plaintiff to give deposition testimony [first] . . . ."); *Brady v. Grendene USA, Inc*., 2014 WL 4925578, at *4 (S.D. Cal. Sept. 26, 2014) ("Courts do not regularly issue orders altering the sequence of depositions unless a specific reason justifies taking one party's deposition before other depositions commence."). Nonetheless, Defendants' alternative argument eventually, albeit briefly, turns to the facts and circumstances of this case. In particular, Defendants suggest that Plaintiffs' allegations of a "complex and far-reaching plot to defraud them out of millions of dollars," along with Ted Blackmon's inconsistent representations regarding the August 23, 2016 letter, warrant the Plaintiffs being deposed first. (R. Doc. 204 at 12). The Court agrees.

To be clear, there is no general rule that a plaintiff should be deposed first simply because they bear the burden of proof at trial or initiated the lawsuit, and the Court does not endorse any such rule. But the particular facts and circumstances of this case do support an order requiring Plaintiffs and any associated witnesses, like their former counsel, to sit for depositions before Defendants and their associated witnesses, like Matt Willson.

Plaintiffs have alleged that the various Defendants conspired together to fraudulently induce them to fire Mr. Blackmon's former counsel (Austin Ward and Scott Barnes), proceed in settlement negotiations uninformed and without representation, and ultimately settle their claims for far less than they were worth, among other things. Critical here are Plaintiffs' allegations that Defendants' conduct alone caused them to take certain actions to their own detriment. Beyond that, third-party discovery has returned information that may be inconsistent with Mr. Blackmon's

allegations that he never received the August 23, 2016 letter and therefore engaged in settlement negotiations oblivious to the additional $11 million in available coverage. (R. Doc. 258 at 2-3); (R. Doc. 258-6) (Ted Blackmon's phone records); (R. Doc. 258-8) (Holland's phone records).

The specific allegations raised by Plaintiffs dictate that Plaintiffs, and any witnesses associated with Plaintiffs—e.g., their former counsel in Florida—sit for depositions before Defendants. *See Roth v. Bank of Commonwealth*, 1988 WL 43963, at *2 (W.D.N.Y. May 4, 1988) ("Each of the plaintiffs' claims is based upon allegations of fraud and misrepresentation and, as such, his knowledge and individual reliance are very important questions to be addressed."). The Court therefore **ORDERS** that **Plaintiffs** and any witnesses associated with Plaintiffs—e.g., their former counsel in Florida—**must sit for depositions before Defendants** and any witnesses associated with Defendants—e.g., Matt Willson.

As a final matter, the Court notes that the parties have not presented any compelling reason why this dispute required its intervention. *Stein v. Tri-City Healthcare Dist*., 2014 WL 458021, at *1 (S.D. Cal. Feb. 4, 2014) ("Courts do not routinely grant protective orders altering the sequence of depositions."). In any litigation, "[n]either side should seek [discovery] determinations from th[e] Court, except as a last resort." *Draper v. Bank of Am., N.A*., 2012 WL 12878606, at *2 (W.D. Tex. Mar. 8, 2012). Unfortunately, the parties here have lost sight of this standard.

The Court has observed a breakdown in the professional relationship of counsel since this case's inception. Litigation is inherently adversarial. But the parties here have descended into such acrimony that what started as a simple dispute about the sequencing of depositions has ballooned into a protracted back-and-forth between the two sides, resulting in numerous discovery motions and impeding the progression of this case.

The Court is ever mindful that this litigation, for the actual parties, is deeply personal. Ted Blackmon has endured, among other things, every parent's worst nightmare—the loss of a child. Defendants find themselves accused of lying and taking advantage of Mr. Blackmon's grief. It is therefore understandable that emotions are running high. But "cooperation between opposing counsel is essential to the efficient operation of our justice system." *Dondi Properties Corp. v. Commerce Sav. & Loan Ass'n*, 121 F.R.D. 284, 292 (N.D. Tex. 1988). Simply put, there is no upside to scorched-earth litigation. The parties are urged to keep this in mind and to take more reasonable positions going forward.

### B.    Attorney-Client Privilege, Work Product Protection, and Privacy

Between February and April of 2017, Ted Blackmon briefly retained Florida attorneys Austin Ward and Scott Barnes to (1) determine whether additional coverage was available for the accident beyond the $1 million provided under the C3 Policy and (2) negotiate Khance's wrongful death claim. (R. Doc. 79 at 18-19). According to Blackmon, Ver Meer lied to his attorneys and told them there was no coverage beyond the $1 million C3 policy. (R. Doc. 79 at 18-20). Blackmon then alleges he fired Ward and Barnes when he learned there was no additional coverage. (R. Doc. 79 at 19-20). Although not in the Complaint, the record also indicates that Ward and Barnes were trying to help Blackmon obtain a settlement loan because he needed money quickly.

Ted and Ruthie Blackmon eventually hired Nick Medley to open the estate of Khance Blackmon and have Ruthie Blackmon appointed as representative in order to finalize the settlement of Khance's wrongful death claim. (R. Doc. 79 at 20). Ted Blackmon eventually learned he could not serve as representative because of a prior felony conviction. Plaintiffs also claim that Ver Meer lied to Medley, telling Medley there was only $1 million in available coverage. (R. Doc. 79 at 20-21).

On September 16, 2019, Defendants subpoenaed Austin Ward, Scott Barnes, and Nick Medley for depositions. (R. Doc. 204 at 14).[1] Plaintiffs raised objections to the depositions on the bases of privilege. (R. Doc. 198). They claimed that, while Defendants could question Ward, Barnes, and Medley about their communications with Ver Meer, all other subject matter was privileged. The parties then sought guidance from the Court on 3 contested areas of inquiry. (R. Doc. 198).

In particular, the parties disagree about whether the attorney-client privilege and work product doctrine preclude Defendants from asking their former counsel about: (1) when and how the Blackmons first learned of the $11 million in coverage under the Bracken Policies and their potential availability; (2) Ted Blackmon's reasons for disengaging Ward and Barnes in April of 2017; and (3) Ted Blackmon's attempts to secure a loan against his potential settlement. (R. Docs. 204 and 205).

On September 27, 2019, Charter Oak filed a Motion to Compel (R. Doc. 210) Plaintiffs' complete responses to their written discovery. Among other things, Charter Oak's written discovery inquired about (1) when and how the Blackmons learned of the additional coverage potentially available under the Bracken Policies; (2) Ted Blackmon's disengagement of Ward and Barnes; and (3) Ted Blackmon's attempts to secure a settlement loan. (R. Doc. 210). In response, the Blackmons objected based on privilege assertions identical to those raised in connection with the depositions of their Florida counsel. Because the same privilege issues are asserted both in the parties' Briefs, as well as Charter Oak's Motion to Compel, the Court considers them together.[2]

---

[1] In their Brief, Defendants relay that "Subpoenas and deposition notices were issued to the Blackmons' former attorneys . . . on September 16, 2019, and those depositions are set for October 22, 2019." (R. Doc. 204 at 14). However, copies of the actual subpoenas and deposition notices are not found in the record. It is also unclear whether any of the Blackmons' former attorneys raised objections to the subpoenas, or otherwise responded.

[2] To be sure, the Court is considering assertions of privilege in 2 procedurally distinct, albeit related, circumstances— written discovery between the parties and Rule 45 subpoenas to non-parties. *See Forever Green Athletic Fields, Inc.*

**Attorney-Client Privilege.**[3] "The attorney-client privilege protects communications made in confidence by a client to his lawyer for the purpose of obtaining legal advice," *King v. University Healthcare Sys., Inc*., 645 F.3d 713, 720 (5th Cir. 2011), and "any communication from an attorney to his client when made in the course of giving legal advice, whether or not that advice is based on privileged communications from the client," *Bross v. Chevron USA, Inc*., 2009 WL 854446, at *4 (W.D. La. March 25, 2009). As the holder of the privilege, "only the client may waive it." *Forever Green Athletic Fields, Inc. v. Babcock Law Firm, LLC,* 2014 WL 29451, at *6 (M.D. La.

---

*v. Babcock Law Firm, LLC*, 2014 WL 29451, at *1 (M.D. La. Jan. 3, 2014) ("Ordinarily, Plaintiffs could not object to a subpoena issued to a nonparty. Nonetheless, Plaintiffs do have standing to raise objections to the subpoena directed to their former attorney because they claim a privilege with respect to the materials subpoenaed . . . ."). Moreover, there have been no motions to quash the subpoenas or motions for protective orders, and the Court is unaware of any objections raised by the subpoenaed non-parties. *See* Fed. R. Civ. P. 26(c) (protective orders); Fed. R. Civ. P. 45(d)(3) (motions to quash).

Nonetheless, the parties have requested the Court's "guidance" on "anticipated" privilege issues with respect to the 3 areas of discovery discussed below. (R. Doc. 198 at 2, 4). Consistent with that request, this Order generally defines the scope of discovery as to those 3 topics, including both the applicability and waiver of any asserted privilege. (R. Docs. 205, 222) (between their Brief and discovery responses, Plaintiffs have asserted attorney-client privilege, work product protection, and privacy interests). Any future discovery conducted on these 3 topics, including the depositions of Austin Ward, Scott Barnes and Nick Medley, should be consistent with this Order.

[3] Rule 501 of the Federal Rules of Evidence requires a federal court sitting in diversity to apply the appropriate state's law concerning the scope and application of the attorney-client privilege. Although this is a diversity case, neither party has devoted much attention to which state's law should apply. Nonetheless, Plaintiffs do briefly mention that the "attorney-client privilege is essentially the same under Florida . . . and Louisiana law . . . ." (R. Doc. 205 at 5 nn.6-7) (citing), and Defendants seem to agree. (R. Doc. 206 at 4). And in later filings, Plaintiffs assume, without any explanation, that Louisiana law applies. (R. Doc. 222 at 3 n.6). The Court also notes that both parties regularly cite to federal cases from across the country. The parties' failure to sufficiently brief the issue is of little concern, however, as there appears to be little material difference, if any, between Louisiana, Florida, and federal common law on the issue of attorney-client privilege. All jurisdictions agree that the attorney-client privilege shields communications between a client and her lawyer if the client is seeking legal advice, and the communications are made in confidence for that purpose and not waived. *See* Fla. Stat. § 90.502; La. C. Evid. art. 506; *Akins v. Worley Catastrophe Response, LLC*, 2013 WL 796095, at *11 (E.D. La. March 4, 2013) ("[F]ederal common law and Louisiana statutory law are materially similar concerning the attorney-client privilege."). Therefore, the Court will apply Louisiana law to govern the scope and applicability of the attorney-client privilege. *See Allied Irish Banks v. Bank of America, N.A.*, 240 F.R.D. 96, 102 (S.D.N.Y. 2007) (court would apply privilege law of New York in diversity action where parties indicated the laws of New York and Maryland were the same). Nonetheless, and consistent with the parties' contentions, parts of the Court's Order cite to federal cases, in addition to case law from Florida, as merely instructive. *Forever Green Athletic Fields, Inc. v. Babcock Law Firm, LLC*, 2014 WL 29541, at *6 n.7 (M.D. La. Jan. 3, 2014) (applying Louisiana law, but also citing to federal cases, given the "material[]" similarities between Louisiana and federal common law concerning the attorney-client privilege).

Jan. 3, 2014). And the party asserting the privilege has the burden of proving its applicability. *Smith v. Kavanaugh, Pierson & Talley*, 513 So.2d 1138, 1143 (La. 1987).

The attorney-client privilege "was intended as a shield, not a sword." *Conkling v. Turner*, 883 F.2d 431, 434 (5th Cir. 1989). As such, when the privilege holder makes a confidential communication a material issue in litigation, "fairness demands treating the defense [or claim] as a waiver of the privilege." *Conkling*, 883 F.2d at 434; *see also Asset Funding Group, LLC v. Adams & Reese, LLP*, 2008 WL 4186884, at *4 (E.D. La. Sept. 9, 2008) ("Waiver includes conduct which would make it unfair for the client to insist on the privilege thereafter."); *Nguyen v. Excel Corp.*, 197 F.3d 200, 207 n.18 (5th Cir. 1999) (recognizing "a client's inability to, at once, employ the privilege as both a sword and a shield."). In other words, a waiver occurs when the holder pleads a claim or defense in such a way that it will inevitably have to "draw upon a privileged communication in order to prevail." *Conono Inc. v. Boh Bros. Const. Co.*, 191 F.R.D. 107, 110 (W.D. La. 1998).

The "at issue" waiver is rooted in fairness—when the holder places the information at issue to his own benefit, allowing "the privilege to protect against disclosure of such information would be manifestly unfair to the opposing party." *Conkling*, 883 F.2d at 434. Ultimately, the question is whether the privilege holder has committed itself to a course of action that will require the disclosure of a privileged communication. *Smith v. Kavanaugh, Pierson & Talley*, 513 So.2d 1138, 1146 (La. 1987).

**Work Product.**[4] Rule 26(b)(3) of the Federal Rules of Civil Procedure restricts a party's ability to obtain work product from an opponent during discovery. Work product consists of

---

[4] While Plaintiffs assert the work product doctrine in their discovery responses, their argument focuses almost entirely on the attorney-client privilege. As discussed below, the Court only finds the work product doctrine applicable to one category of information—when and how the Blackmons learned of the Bracken Policies.

"documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent)." Fed. R. Civ. P. 26(b)(3)(A). The work product protection is broader in scope and reach than the attorney-client privilege.  The attorney-client privilege "extends only to client communications, while the work product protection encompasses much that has its source outside client communications." *Stoffels v. SBC Communications, Inc.*, 263 F.R.D. 406, 412 (S.D. Tex. 2009). This protection is not absolute, however. Like the attorney-client privilege, "opinion work product, that which conveys the mental impressions . . . of an attorney," may be disclosed when the holder waives the protection by placing the protected material "at issue" in the litigation. *Conoco Inc. v. Boh Bros. Const. Co*., 191 F.R.D. 107, 118 (W.D. La. 1998) ("Opinion work product. . . becomes subject to disclosure when mental impressions are at issue in a case and the need for the material is compelling . . . .").

### (1)    When and how the Blackmons learned of the Bracken Policies

In their Complaint, Plaintiffs claim that Ted Blackmon never received the August 23, 2016 letter notifying him on the additional $11 million in coverage potentially available under the Bracken Policies, and that Ver Meer only disclosed the $1 million C3 Policy issued by Charter Oak to both the Blackmons and their Florida Counsel (Austin Ward, Scott Barnes, and Nick Medley). They go on to claim that Ted Blackmon hired Austin Ward and Scott Barnes during settlement negotiations with Ver Meer to ensure a more complete recovery for Khance Blackmon's claim, which included "efforts" by Ward and Barnes to determine if any additional coverage was available for the accident, beyond the $1 million provided under the C3 Policy. (R. Doc. 79 at 18). Because Ver Meer allegedly concealed the Bracken Policies, the Blackmons claim they settled Khance Blackmon's claim on October 19, 2017, for far less than it was worth — $650,000.00. (R.

Doc. 79 at 22) ("Unbeknownst to Ruthie Blackmon or Ted Blackmon at the time of the signing of the agreement to settle the claims of Khance Blackmon, and directly contrary to the representations made by Anthony Ver Meer on behalf of the Defendants, there were in fact two other policies providing coverage . . . .").

During discovery, Charter Oak sent Requests for Production and Interrogatories to the Blackmons asking when they learned of the Bracken Policies and their potential availability for this accident. In their responses, Plaintiffs refused to answer or provide any relevant documents:

**Interrogatory Nos. 1 and 2 (Ted and Ruthie Blackmon):**
Please explain in detail how and when you first learned [(1)] that Jaramillo may have been in the course and scope of employment with Bracken at the time of the accident . . . . [and] [(2)] of the existence and limits of Bracken's policies . . . including who conveyed this information to you, the method of communication, the time and date of the communication, and the precise information conveyed.

**Answer to Interrogatory Nos. 1 and 2 (Ted and Ruthie Blackmon):**
The Plaintiff objects to this request on the grounds that it seeks information protected by attorney-client privilege, work-product doctrine, and/or other potentially applicable privileges. However, the Plaintiff states that he was not aware of this fact prior to executing the alleged settlement agreement.

**Request for Production Nos. 27-28 (Ted Blackmon) and**
**Request for Production Nos. 19-20 (Ruthie Blackmon):**
Please produce all documents relating to how you leaned [(1)] that Jaramillo may have been in the course and scope of employment with Bracken at the time of the accident . . . [and] [(2)] of the existence and limits of Bracken's policies . . . .

**Response to Request for Production Nos. 27-28 (Ted Blackmon) and**
**Response to Request for Production Nos. 19-20 (Ruthie Blackmon):**
The Plaintiff objects to this request on the grounds that it seeks information protected by attorney-client privilege, work-product doctrine, and/or other potentially applicable privileges. Subject to and without waiving that objection, after the Plaintiff's attorneys submitted civil remedy notices to the Florida Department of Financial Services regarding the issues raised in this litigation, Robert Czerniak, on behalf of Travelers, sent the Plaintiff's attorney a letter and attachments responding to the allegations. The letter and attachments are produced as BLACKMON000083-97."

(R. Doc. 210-8 at 27-28, 52-53) (T. Blackmon's Resps. to Interrog. Nos. 1-2 and Request for Produc. Nos. 27-28); (R. Doc. 210-9 at 10-11, 30-31) (R. Blackmon's Resps. to Interrog. Nos. 1-2 and Request for Produc. Nos. 19-20). Plaintiffs likewise object to the Rule 45 subpoenas issued to their Florida counsel (Ward, Barnes and Medley), to the extent Defendants seek testimony about when and how Plaintiffs learned of the Bracken Policies.

In its Motion to Compel, Charter Oak first suggests it is "difficult to envision a situation where the information regarding how Ted and Ruthie Blackmon *first* learned of the misrepresentations allegedly made to them could be privileged," because "[a]lthough [they] may have discussed suspected misrepresentations with their counsel, they presumably would have . . . had some information from another source in order to prompt them to see a lawyer in the first place." (R. Doc. 210-1 at 7). Moreover, the fact that a conversation took place between Plaintiffs and their counsel is not privileged. (R. Doc. 235 at 1). But even if the attorney-client privilege does apply to this information, any protection has been waived because Plaintiffs have "injected this issue into the litigation." (R. Doc. 210-1 at 8). When and how Plaintiffs learned of the Bracken Policies "goes to the heart of the case." (R. Doc. 210-1 at 7).

In response, the Blackmons suggest that when and how they learned of the Bracken Policies is both irrelevant and privileged. (R. Doc. 222 at 4-6). First, they claim the information is irrelevant because they believe they do not allege reliance on the advice of counsel in negotiating the settlement. But more important, Plaintiffs suggest they "did not open the door to discovery of privileged communications simply by alleging fraud" and they have not pleaded their claims "in such a way that [they] will be forced inevitably to draw upon a privileged communication in order to prevail . . . ." (R. Doc. 222 at 3). Plaintiffs should revisit their Complaint. (R. Doc. 79).

First, when and how the Blackmons first learned of the Bracken Policies is not only relevant but crucial to their causes of action for fraudulent omissions, material misrepresentations, detrimental reliance, and the like. These claims all require a plaintiff to show reliance on an omission or misrepresentation of a material fact to his or her own detriment. *See Water Craft Mgmt., L.L.C. v. Mercury Marine*, 361 F. Supp. 2d 518, 556 (M.D. La. 2004) ("Louisiana law requires a plaintiff to prove the following to recover for a claim of detrimental reliance: (1) a representation was made; (2) there was justifiable reliance thereon; and (3) there was a change of position to one's detriment because of the reliance."); *Sheppard v. Liberty Mut. Ins. Co*., 2016 WL 6807400, at *2 (E.D. La. Nov. 17, 2016) ("Fraud may [] result from silence or inaction. The elements of a Louisiana fraud or intentional misrepresentation claim are: 1) a misrepresentation of a material fact; 2) made with intent to deceive; and 3) causing justifiable reliance with resultant injury.").

Here, Plaintiffs claim to have settled Khance Blackmon's claim before they knew about the $11 million potentially available under the Bracken Policies. In other words, they settled Khance's claim for less than its worth because they relied on Ver Meer's misrepresentations about the amount of available coverage. Therefore, when and how the Blackmons first leaned of the additional coverage is certainly relevant.

Second, even assuming this information is protected by the attorney-client privilege, as the Blackmons insist, that privilege has been waived. To begin, Plaintiffs cannot at once claim that when and how they learned of the Bracken Policies' existence is entirely privileged, but then selectively disclose that they were "not aware of [the Policies] prior to executing the alleged settlement agreement." (R. Doc. 210-8 at 28). Not only does this constitute a partial waiver, but it is—in the most classic sense—a use of the attorney-client privilege as both a sword and a shield.

As the Louisiana Supreme Court has made clear, "the privilege is to suppress the truth, but that does not mean that it is a privilege to garble it; it should not furnish one side with what may be false evidence and deprive the other of the means of detecting the imposition." *Smith v. Kavanaugh, Pierson & Talley*, 513 So. 2d 1138, 1145 (La. 1987) ("If Mrs. Smith were allowed to use only a part of these communications as evidence" of her "lack of knowledge" and "suppress the remainder, an unfair risk of a decision based on garbled or distorted information would be created." *Id.* at 1147.). Therefore, Charter Oak and the remaining Defendants are entitled to discover evidence of when and how Plaintiffs first learned of the Bracken Policies and their applicability to this accident. *See Asset Funding Group, LLC v. Adams & Reese, LLP*, No. 07-2965, 2008 WL 4186884, at *4 (E.D. La. Sept. 9, 2008) ("Waiver includes conduct which would make it unfair for the client to insist on the privilege thereafter."); *Nguyen v. Excel Corp.*, 197 F.3d 200, 207 n.18 (5th Cir. 1999) (recognizing "a client's inability to, at once, employ the privilege as both a sword and a shield."); *In re Itron, Inc.*, 883 F.3d 553, 558 (5th Cir. 2018) ("And to prevent selective or misleading disclosures, fairness dictates that the waiver extend to related subject matter. Hence the animating maxim that the privilege cannot "be used as both sword and shield."); *Smith*, 513 So. 2d at 1144 ("The rationale of a waiver based on partial disclosure is that permitting a party to make such an incomplete disclosure, without losing his privilege with respect to the remainder of the communication or communications on that subject, would be unfair to the adversary because it would give the privilege-holder unchecked editorial control over the available evidence to a degree that would practically ensure a distorted presentation of the communication or communications.").

Beyond that, in their Complaint, Plaintiffs not only place their knowledge of the Bracken Policies 'at-issue,' they inextricably tie Ward and Barnes' representation of Ted Blackmon to the

availability of additional coverage. To recap, Plaintiffs claim that Ted Blackmon never received Ver Meer's August 23, 2016 letter. (R. Doc. 79 at 18). In discovery, however, Defendants obtained Mr. Blackmon's phone records indicating calls were placed to Matt Willson and Bracken's attorney on September 2, 2016—the two individuals identified in the letter. Nonetheless, Plaintiffs' Complaint goes on to allege that Ted Blackmon hired Ward and Barnes in February of 2017 to determine whether additional coverage was available (R. Doc. 79 at 18) and that Mr. Blackmon only fired Ward and Barnes because of Ver Meer's misrepresentations about the lack of additional coverage. According to the Blackmons, Ver Meer concealed the Bracken Policies so that Ted Blackmon would terminate Ward and Barnes' and continue in negotiations without counsel.

Despite all this, Plaintiffs claims they have not pleaded their claims "in such a way that [they] will be forced inevitably to draw upon a privileged communication." (R. Doc. 222 at 3). But how can this be, when Ward and Barnes' representation of Ted Blackmon is so bound up in Plaintiffs' alleged lack of knowledge of the Bracken Policies? Indeed, Plaintiffs claim that Ver Meer's misrepresentations were the reason Ted Blackmon both hired and fired Austin Ward and Scott Barnes. *Compare In re Itron, Inc.*, 883 F.3d 553, 560 (5th Cir. 2018) ("Although the complaint seeks as damages the amount of Itron's settlement with Consert, it never specifically pleads reliance on any legal advice. Nor does it refer to any confidential attorney-client communications. In fact, a person reading the complaint would have no idea that Itron even had attorneys" in the underlying settlement negotiations.)

According to the Louisiana Supreme Court, an 'at-issue waiver' occurs when there has been a "misuse by the privilege holder or unfairness to his opponent." *Smith v. Kavanaugh, Pierson & Talley*, 513 So. 2d 1138, 1147 (La. 1987). Here, Plaintiffs have clearly placed their knowledge of the Bracken policies at issue. *See Asset Funding Grp. v Adams & Reese, LLP*, 2008 WL 927937,

at *7 (E.D. La. April 4, 2008) (plaintiff waived attorney-client privilege as to communications with its other attorney regarding plaintiff's knowledge of a pre-existing environmental condition because plaintiff interjected the issue into litigation by claiming it was unaware of the environmental condition). Moreover, through their own pleadings, the Blackmons have inextricably intertwined Ward and Barnes' representation of Ted Blackmon with the alleged fraud. *Cf., In re Itron, Inc.*, 883 F.3d at 560 ("In short, because Itron's complaint mentions no attorneys, no attorney-client communications, and no attorney-client relationships, it cannot be said to use the attorney-client privilege as a sword. The privilege thus remains available.").

Plaintiffs have also stated that, in settlement negotiations, "Plaintiffs relied upon representations and information provided by Defendants directly and *indirectly* to Plaintiffs and their attorneys including but not limited to representatives of Ward & Barnes, P.A." (Pl.'s Resp. to Interrog. No. 3, R. Doc. 204-9 at 11) (emphasis added). In other words, Plaintiffs are, in part, claiming to have relied on information relayed by their Florida attorneys after speaking with Ver Meer, thereby waiving the privilege. *See Naglak v. Pennsylvania State Univ.*, 133 F.R.D. 18, 23 (M.D. Pa. 1990) ("Moreover, plaintiff has waived the confidentiality of communications between her and her attorney on this issue, since she related what her attorney purportedly told her about defendants' representations and assurances in her complaint.").

What's more, Plaintiffs have listed Austin Ward, Scott Barnes, and Nick Medley as trial witnesses (R. Blackmon's Resp. to Interrog. No. 10, R. Doc. 204-9 at 16); (T. Blackmon's Resp. to Interrog. No. 8, R. Doc. 204-8 at 33). Although they fail to specify the intended testimony of each witness, they have previously described Austin Ward as "a witness who would have had every reason to continue in the case if he had not been misled" and "would substantiate the fraud" (R. Doc. 33 at 14). *Cf., Profit Point Tax Techs., Inc. v. DPAD Grp., LLP*, 2020 WL 5088040, at

*4 (W.D. Wis. Aug. 28, 2020) ("although PPTT has arguably placed its state of mind in connection with the Fee Splitting Agreement and Release at issue by filing its fraudulent misrepresentation claim, there is nothing in the record before the court to suggest that it intends to prove its claim . . . with its attorneys. Unless and until there is evidence of such intent, there is no basis to find . . . waive[r] . . . of the attorney-client privilege.").

Plaintiffs cannot reasonably expect to call their former attorneys as witnesses to 'substantiate' their claims, while at the same time fully preserving the attorney-client privilege. *See Forever Green Athletic Fields, Inc.*, 2014 WL 29451, at *11 (plaintiffs waived attorney-client privilege and work product by "indicating their intent to offer [their former attorney's] testimony to 'prove'" part of their claim); *JJK Mineral Co ., LLC v. Swiger*, 292 F.R.D. 323, 336 (N.D.W.V. 2013) ("[O]nce a client decides to call the attorneys as witnesses, the work-product protection must give way to full disclosure on any issue to which they will testify. Anything less would permit manipulation of the truth.").

Under these circumstances, the attorney-client privilege must give way. *See Snalloy Corp. v. Gray*, 142 F.R.D. 266, 269-70 (D. Del. 1992) (defendant waived privilege by bringing suit for fraudulent misrepresentation and rescission by putting its state of mind at issue; communications with attorneys who negotiated the agreement were relevant to show the parties' intent, knowledge, and reliance in entering the agreements); *Sedco International S.A. v. Cory*, 683 F.2d 1201, 1206-07 (8th Cir. 1982) ("[B]y asserting fraud, [the defendant] . . . waived his right to assert the privilege to prevent disclosure of communications which might have proven he did not rely on [the plaintiffs'] statements." The testimony of defendant's former attorney is relevant to the extent it "might demonstrate that [the defendant] acted as he did for reasons unrelated to the [plaintiff's] misrepresentations."); *Pitney-Bowes, Inc. v. Mestre*, 86 F.R.D. 444, 447 (S.D. Fla. 1980)

("[Plaintiff] has injected a narrow issue into the dispute, namely, the intent of the parties. . . . [Plaintiff] asserted that it had intended to enter into modifications of pure patent licensing agreements. It then sought to withhold communications between its attorneys and executives that might reveal the true intent behind the agreements. [Plaintiff] has placed in issue the very soul of this litigation—the intent of the parties with regard to construction of certain terms of the Agreements."); *Sax v. Sax*, 136 F.R.D. 542, 544 (D. Mass. 1991) ("His assertion of the counterclaims [for fraudulent misrepresentation with respect to the agreement] in this case was an implicit waiver of the privilege as to the subject matter of the agreement and the circumstances leading to its execution."); *Union County, IA v. Piper Jaffray & Co., Inc*., 248 F.R.D. 217, 222-23 (S.D. Iowa 2008) (by filing suit alleging that financial advisor failed to disclose material information to county in relation to bond offerings, county impliedly waived its attorney-client privilege with regard to communications relating to the transaction at issue; "[P]ermitting Union County to assert the attorney-client privilege deprives Piper of information necessary to fairly defend against Union County's claim. Indeed, at the very core of Union County's allegations is the assertion that it relied on Piper's advice to its detriment, an allegation the truth of which may only be assessed by examination of privileged communications").

"Any other holding would give Plaintiffs 'unchecked editorial control' over the evidence available to [Defendants] 'to a degree that would practically ensure a distorted presentation' of evidence to the fact finder." *Forever Green Athletic Fields, Inc. v. Babcock Law Firm, LLC*, 2014 WL 29451, at *11 (M.D. La. Jan. 3, 2014) (quoting *Smith v. Kavanaugh, Pierson & Talley*, 513 So. 2d 1138, 1144 (La. 1987)).

Therefore, Charter Oak's Motion to Compel (R. Doc. 210) is **GRANTED** to the extent it seeks complete responses to **Interrogatory Nos. 1 and 2** and **Request for Production Nos. 27**

**and 28** to Ted Blackmon, as well as **Interrogatory Nos. 1 and 2** and **Request for Production Nos. 19 and 20** to Ruthie Blackmon. Plaintiffs must supplement their responses within **21 days** of this Order.

And for the same reasons, Defendants' Brief (R. Doc. 204) is **GRANTED** to the extent they seek permission to question Plaintiffs' Florida counsel (Ward, Barnes, and Medley) about Plaintiffs' actual or constructive knowledge of the Bracken Policies. *In re Ford Motor Co. Bronco II Product Liability Litigation*, 982 F. Supp. 388, 396-97 (E.D. La. 1997) ("[c]laims of fraudulent concealment generally require that . . . plaintiff did not have actual or constructive knowledge of the information . . ."). Therefore, to the extent Ted Blackmon (or Ruthie Blackmon) had any communications with Austin Ward, Scott Barnes, or Nick Medley about the existence of the Bracken Policies between **August 23, 2016** (when the Ver Meer letter was sent), and **January 18, 2018** (when suit was filed), those communications have been sufficiently placed at issue by Plaintiffs, and the attorney-client privilege has been waived.

While the parties mostly focus on waiver of the attorney-client privilege, the Court notes that Plaintiffs have alleged that Austin Ward and Scott Barnes "made efforts to determine whether additional coverage" existed as part of their representation of Ted Blackmon. (R. Doc. 79 at 18). Under Louisiana law, "[c]laims of fraudulent concealment generally require that plaintiff prove that defendant wrongfully concealed information, and that plaintiff did not have actual or constructive knowledge of the information and could not have learned of the information through exercise of due diligence." *In re Ford Motor Co. Bronco II Product Liability Litigation*, 982 F. Supp. 388, 396-97 (E.D. La. 1997). Moreover, it is "well settled" that "notice to an attorney" is "notice to the client." *DeBaillon v. Consolidated Operating Co., Inc.*, 975 So.2d 682, 686 (La.

App. 3 Cir. 2008) (clients "had knowledge of the alleged fraud or ill practices because their attorneys of record had knowledge of the fraud or ill practices.").

Therefore, if either Austin Ward or Scott Barnes uncovered information indicating that additional coverage was potentially available for the June 15, 2016 accident, that knowledge would be imputed to Ted Blackmon. *DeBaillon*, 975 So.2d at 686 (clients "had knowledge of the alleged fraud or ill practices because their attorneys of record had knowledge of the fraud or ill practices."). This information goes to the heart of the alleged fraudulent concealment and related claims. Therefore, both the attorney-client privilege and work product protection are waived by Ted Blackmon as to Ward and Barnes' efforts to determine the existence of additional coverage.[5] Defendants' Brief is therefore **GRANTED** to the extent Ted Blackmon has waived any work product protections, in addition to the attorney-client privilege, regarding Austin Ward and Scott Barnes' investigation into additional coverage and their communications with Ted Blackmon regarding that investigation. *See Martin v. White*, 219 So. 2d 219, 221 (La. App. 1 Cir. 1969) ("It is settled that the knowledge of an attorney is imputable to his client. Since plaintiff's attorney was aware of defendant's testimony at the time it was given, plaintiff is charged with knowledge thereof as of that time. That testimony was given more than one year before this suit was filed, and plaintiff testified that it forms the basis of her suit [for fraud]. The district court properly maintained the exception of prescription.").

---

[5] The Court is unaware of whether either Austin Ward or Scott Barnes ever objected to Defendants' Rule 45 subpoenas by asserting work product, or whether they might assert the protection during their depositions. Therefore, it does not analyze any assertion of work product by either Austin Ward or Scott Barnes. *See Liberty Mut. Ins. Co. v. Tedford*, 644 F. Supp. 2d 753, 764 (N.D. Miss. 2009) ("Unlike the attorney-client privilege, the protections of the work product doctrine are held by both the client and the attorney, and either may assert it.").

**(2)    Ted Blackmon's Disengagement of Austin Ward and Scott Barnes**

Again, Plaintiffs have claimed repeatedly that Ver Meer lied to Ward and Barnes about the additional coverage so that Ted Blackmon would end their representation and continue in negotiations without the help of counsel. *See* (R. Doc. 237-1 at 4) (Plaintiffs claims they were "fraudulently induced into becoming unrepresented"); (R. Doc. 252-1 at 9) ("gave Defendants reason to misrepresent the available coverages to the Blackmons and their Florida counsel to prevent them from being represented by counsel during settlement negotiations"); (R. Doc. 252-1 at 11) ("Defendants had a motive for misrepresenting the amount of coverage to the Blackmons' counsel in Florida to ensure the Blackmons remained unrepresented during settlement negotiations"); (R. Doc. 79 at 19-25) ("The settlement negotiations with Anthony Ver Meer occurred during times when Ruthie Blackmon and Ted Blackmon were not represented by legal counsel directly as a result of the fraudulent misrepresentations of Anthony Ver Meer . . . ."); (R. Doc. 79 at 26) ("Defendants committed their fraudulent and wrongful acts in an effort to deny the Blackmons of legal representation."); (R. Doc. 79 at  29) (Ver Meer "intentionally withheld and concealed information regarding those policies as part of a scheme to prevent Plaintiffs from being represented by counsel in their negotiations."); (R. Doc. 107 at 3) ("This is a key piece of the Blackmons' case, as . . . Ver Meer's misrepresentations and omissions to Mr. Ward were intended to and actually did deprive Ted and Ruthie Blackmon of the assistance of their then-counsel in Florida at a critical point in the negotiations."). Indeed, Plaintiffs have gone so far as to claim: "If Ted Blackmon had known about the additional coverages before retaining counsel in Florida, as alleged by Travelers, he would have disclosed it to his Florida attorney, Mr. Ward, who would then have pursued the Blackmons' case rather than turning down a wrongful death suit with $12,000,000 in policy limits." (R. Doc. 107 at 4).

Nonetheless, Ted Blackmon refused to respond to Charter Oak's Interrogatory No. 3 and Request for Production No. 26, which sought information about his reasons for disengaging Ward and Barnes. (R. Doc. 210-6 at 9, 16). Moreover, Plaintiffs have objected to Defendants' Rule 45 deposition subpoenas to the extent they seek to depose Austin Ward or Scott Barnes about Ted Blackmon's termination of their representation. (R. Doc. 205). But it is hard to see how Plaintiffs could raise these allegations and still expect the privilege to hold. "It would undermine the most basic concepts of fairness" to allow Ted Blackmon to claim that Ver Meer fraudulently induced him into proceeding in negotiations unrepresented, and that Defendants are liable for that conduct, "while precluding the discovery of contrary evidence." *Forever Green Athletic Fields, Inc. v. Babcock Law Firm, LLC*, 2014 WL 29541, at *14 (M.D. La. Jan. 3, 2014). The truth of these factual allegations can only be assessed by examining otherwise privileged communications. *See Johnson Matthey, Inc. v. Research Corp.*, 2002 WL 1728566, at *2 (S.D.N.Y. July 24, 2002) (Thus, "even if the privilege holder does not attempt to make use of the privileged communication[,] he may waive the privilege if he makes factual assertions the truth of which can only be assessed by examination of the privileged communication."). For that reason, Ted Blackmon has waived the attorney-client privilege with respect to any communications or documents indicating his reasons for disengaging Austin Ward and Scott Barnes. The Court does not find any waiver of work product, however, with respect to this topic.

Therefore, Charter Oak's Motion to Compel (R. Doc. 210) is **GRANTED** to the extent it seeks complete responses to Interrogatory No. 3 and Request for Production No. 26 from Ted Blackmon. Ted Blackmon must supplement his responses to **Interrogatory No. 3** and **Request for Production No. 26** within **21 days** of this Order.

For the same reasons, Defendants' Brief (R. Doc. 204) is **GRANTED** to the extent they seek to depose Austin Ward and Scott Barnes about Ted Blackmon's reasons for ending their representation.

> **(3)   Ted Blackmon's Attempts to Secure a Settlement Loan**

Charter Oak's Request for Production No. 41 to Ted Blackmon sought documents relevant to Mr. Blackmon's attempts to "secure a loan based on [his] anticipated settlement . . . ." (R. Doc. 210-8 at 58). Defendants likewise want to "explore [this] topic[]" during the depositions of Mr. Blackmon's Florida counsel. (R. Doc. 204 at 20). Plaintiffs have objected to the production of this information as "private, confidential, irrelevant [and] harassing." (R. Doc. 210-10 at 2-4); (R. Doc. 210-8 at 58); (R. Doc. 207 at 10).

To establish liability for fraud, the plaintiff must prove that the conduct in question was a cause-in-fact of the resulting harm. *Young v. First Nat. Bank of Shreveport*, 794 So.2d 128, 137 (La. App. 2 Cir. 2001). According to Plaintiffs, "[v]oicemails from Mr. Blackmon to Ver Meer . . . demonstrate the emotional and financial distress that Mr. Blackmon was under during these negotiations, and Ver Meer and Travelers used their knowledge of Mr. Blackmon's distress to take advantage of him and cause him to settle for far less than he would have otherwise agreed to had he known of the additional policies." (R. Doc. 207 at 2). In other words, Plaintiffs claim that Ver Meer's misrepresentations caused them to agree to the settlement for $650,000.00 on October 19, 2017. Defendants, however, point to evidence that Ted Blackmon was in financial distress and in need of quick cash. (R. Doc. 210-1 at 14). Specifically, Defendants rely on attempts by Ted Blackmon to obtain an advance from Ver Meer on the eventual settlement of Khance Blackmon's claim and Ted Blackmon's efforts to secure a loan against the future settlement, including withheld

emails between attorney Scott Barnes and third parties regarding settlement loans. (R. Doc. 210-10 at 2-4).

      The Court understands the sensitive nature of this information, and it does not take its disclosure lightly. But Plaintiffs have placed their motive for agreeing to settle Khance Blackmon's claim for a certain amount ($650,000.00), at a certain time (October 19, 2017), at issue. *See, e.g.*, *Kirkham v. Am. Liberty Life Ins. Co*., 717 So. 2d 1226, 1229 (La. App. 2 Cir. 1998) (plaintiff's "degree[] of reliance" on alleged misrepresentations must be examined in determining fraud). And Defendants cannot defend against this case without being permitted to discover whether the agreement to settle was motivated, in whole or in part, by Ted Blackmon's financial distress. *See Sun Drilling Prod. Corp. v. Rayborn*, 798 So. 2d 1141, 1153, (La. App. 4 Cir. 2001) ("Moreover, for fraud or deceit to have caused plaintiff's damage, he must at least be able to say that had he known the truth, he would not have acted as he did to his detriment. Whether this element is labeled reliance, inducement, or causation, it is an element of a plaintiff's case for fraud."); *Hunters Run Gun Club, LLC v. Baker*, 2019 WL 3400696, at *6 (M.D. La. July 26, 2019) ("a party asserting fraud is required to allege that it was unaware that the opposing party's representation was false, and that the misrepresentation caused it to act differently than it would have had it known the truth.");  Banks v. New York Life Ins. Co., 98-0551 (La. 7/2/99), 737 So. 2d 1275, 1281 ("In determining whether fraudulent . . . misrepresentations have occurred, the circumstances surrounding each purchase by each policyholder must be examined to determine whether the purchaser relied on representations made . . . and if so, whether the representations affected the circumstances of each sale."). The Court therefore finds this information discoverable.

Therefore, Charter Oak's Motion to Compel (R. Doc. 210) is **GRANTED** as to **Request for Production No. 41** to Ted Blackmon. Mr. Blackmon must produce any relevant documents withheld in response to Request for Production No. 41 within **21 days** of this Order.

And although this issue was raised in Defendants' Brief (R. Doc. 204), Plaintiffs did not assert the attorney-client privilege in their Response to Defendants' Brief (R. Doc. 207). The Court nonetheless will assume that Plaintiffs also objected to deposing Austin Ward and Scott Barnes on this subject matter, as protected by the attorney-client privilege. Here, Plaintiffs' claim that Ted Blackmon only hired Ward & Barnes to ensure a more complete settlement and determine whether other insurance was available. Nonetheless, the record indicates that the law firm of Ward & Barnes was also heavily involved in Mr. Blackmon's efforts to secure a settlement loan between February of 2017 and April of 2017. Therefore, Defendants' Brief (R. Doc. 204) is **GRANTED** to the extent the Court finds Ted Blackmon has waived the attorney-client privilege as to this topic and Defendants may question Scott Barnes and Austin Ward about whether Mr. Blackmon ever communicated that his decision to settle Khance Blackmon's claim might be motivated by his ability or inability to secure a settlement loan. The Court does not, however, find any similar waiver of work product.

### C.    Ted Blackmon's Criminal History

Charter Oak's Interrogatory No. 20 asked Ted Blackmon to disclose the following information about his criminal history:

> **Interrogatory No. 20:**
> If you have ever been charged with a crime, please identify each criminal charge, specify the parish/county/state where the criminal charge was brought, and explain the disposition of the charge. If you served any jail time, please specify the dates and the correctional facility where you were incarcerated.

(R. Doc. 210-8 at 40-41). Ted Blackmon objected to the requested information, stating:

**Answer to Interrogatory No. 20:**
The Plaintiff objects to this request on the grounds that it seeks information that is overly broad and invasive of the Plaintiff's privacy and is inadmissible and irrelevant to any issue in this action, seeks information that is personal, confidential, and private . . . and not proportional to the needs of the case . . . . The Plaintiff further objects to this request as it serves only to humiliate, embarrass, harass and/or demean the Plaintiff and cause unnecessary and needless increase of the cost of litigation. Subject to and without waiving those objections, the Plaintiff has no information responsive to this request during the time periods under Federal Rule of Evidence 609.

(R. Doc. 210-8 at 41). The Court agrees with Plaintiff that Interrogatory No. 20 is objectionable as overly broad. It is not limited in time or in scope. Indeed, it is not even limited to convictions, but instead seeks any criminal charges brought against Ted Blackmon—for any crime at any point in his life.

"When a request is overly broad on its face, the party seeking the discovery has the burden to show the relevancy of the request." *Johnson v. Kraft Foods North American, Inc*., 236 F.R.D. 535, 542 (D. Kan. 2006); *see also Moser v. Health Ins. Innovations, Inc*., 2018 WL 6735710, at *13 (S.D. Cal. Dec. 21, 2018) ("Generally, a discovery request without temporal or other reasonable limitations is objectionable on its face as overly broad.").

In its Motion to Compel, Charter Oak ultimately explains that it requested information about Mr. Blackmon's criminal history because it "must be able to explain to the jury why Ruthie Blackmon became involved in the settlement negotiations at the tail end (*i.e.*, because Ted Blackmon was precluded from serving as the personal representative of Khance's estate due to his status as a convicted felon)." (R. Doc. 210-1 at 12-13). But Charter Oak's representation that it only needs evidence of the felony conviction that precluded Mr. Blackmon from serving as the estate representative does little more than highlight the unreasonableness of its unlimited request. Given Charter Oak's stated goal, and the facts of this case, a request that Mr. Blackmon identify

the felony conviction that precluded him from serving as the estate representative would have appropriately fallen within the scope of permissible discovery.

The Court, however, is reluctant to compel any further response, given the unreasonable scope of Charter Oak's request, and the sensitive nature of the information being sought. Therefore, the Court **DENIES** Charter Oak's Motion to Compel, to the extent it seeks a **complete response** to **Interrogatory No. 20**. *See Johnson v. Kraft Foods N. Am., Inc*., 236 F.R.D. 535, 542 (D. Kan. 2006) ("The Court, however, will not compel further response when inadequate guidance exists to determine the proper scope of a[n] [overly broad] request."). Instead, given the relevance of Mr. Blackmon's inability to serve as the estate representative, the Court will **ORDER** that Mr. Blackmon **comply** with one of the following **options**:

> (1) Mr. Blackmon may, without divulging the details of any felony convictions, agree to stipulate to his status as a convicted felon and that it precluded him from serving as the representative of Khance Blackmon's estate under Florida law. If Mr. Blackmon chooses to stipulate to his status as a convicted felon, he has no further obligation to respond to Charter Oak's Interrogatory No. 20.

> (2) Mr. Blackmon may supplement his response to Interrogatory No. 20 by disclosing the felony conviction (including the crime, jurisdiction and date of conviction) that precluded him from serving as the representative of Khance Blackmon's estate. If more than one felony conviction applies, Mr. Blackmon need only disclose one.

Mr. Blackmon must **comply** with either **Option No. 1** (stipulation) or **Option No. 2** (supplemental response) within **21 days** of this Order.

### D.    Distribution of $650,000.00 Settlement

Charter Oak's Interrogatory No. 12 to Ruthie Blackmon asked her to explain "how the $650,000 settlement payment was distributed . . . ." (R. Doc. 210-1 at 15). Ruthie Blackmon objected to the request, suggesting it was "not relevant" and served "only to humiliate, embarrass, harass and/or demean the Plaintiffs." (R. Doc. 210-9 at 17). In its Motion to Compel, Charter Oak explains the interrogatory was not intended to harass, but rather to show that "Ted Blackmon was the sole beneficiary of the $650,000 settlement regarding Khance and is the real-party-in interest in this case." (R. Doc. 210-1 at 16). The Court agrees.

Not only is this information relevant for the reasons stated by Charter Oak, it is difficult to understand Plaintiffs' reluctance to provide it. Indeed, the record, including the Complaint, already indicates that Ted Blackmon was his son's only heir. (Pls.' Compl., R. Doc. 79 at 13) (Ted Blackmon was Khance's "sole and rightful heir"); (R. Doc. 57-3) (describing Ted Blackmon as "100% heir of the estate of Khance Blackmon"). Unfortunately, this dispute is just one of many examples of the unreasonable positions that both sides have taken throughout discovery. Therefore, Charter Oak's Motion to Compel is **GRANTED** to the extent it seeks Ruthie Blackmon's complete response to **Interrogatory No. 12**. Ruthie Blackmon must **supplement** her response to Interrogatory No. 12 within **21 days** of this Order.

### E.    Ted Blackmon's Vehicle Registrations

Charter Oak's Request for Production No. 11 asked Ted Blackmon to produce his vehicle registrations from January 1, 2013, to February 1, 2018. (R. Doc. 210-8 at 47). While Ted Blackmon originally objected, he has since agreed to produce any vehicle registrations in his possession, custody or control. (R. Doc. 222 at 10). During a discovery conference with the Court, Plaintiffs' counsel confirmed that Mr. Blackmon no longer objects to Request for Production No.

11 and indicated that they have produced the only vehicle registration that they were aware of, and that they would supplement their response if additional registrations were located. Although Request for Production No. 11 is no longer at issue, the Court nonetheless **GRANTS** Charter Oak's Motion to Compel as to **Request for Production No. 11**. While Ted Blackmon has **complied** with Request for Production No. 11, if Mr. Blackmon locates additional vehicle registrations responsive to Request for Production No. 11, those must be produced in accordance with Rule 26(e) of the Federal Rules of Civil Procedure.

Signed in Baton Rouge, Louisiana, on October 14, 2020.

_____
**SCOTT D. JOHNSON**
**UNITED STATES MAGISTRATE JUDGE**