# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA

**TED MARIO BLACKMON, et al.**                              **CIVIL ACTION**

**VERSUS**                                                  **NO. 18-142-BAJ-SDJ**

**BRACKEN CONSTRUCTION
COMPANY, INC., et al.**

---

### ORDER ON PLAINTIFFS' MOTIONS TO COMPEL, PLAINTIFFS' MOTION FOR LEAVE TO PROPOUND ADDITIONAL INTERROGATORIES, AND INSURER DEFENDANTS' MOTION FOR PROTECTIVE ORDER

---

After the Court's previous Order (R. Doc. 278), there are still 8 discovery motions that remain pending:

- Plaintiffs' Motion to Compel (R. Doc. 213) complete discovery responses from the Insurer Defendants, including any claim files associated with the underlying accident;

- Plaintiffs' Motion for Leave to Propound Additional Interrogatories (R. Doc. 237) regarding Shemika Robinson's claim and the settlement of her estate's lawsuit in Texas;

- the Insurer Defendants' Motion for Protective Order (R. Doc. 244) which, in reality, is just another opposition to Plaintiffs' earlier Motion to Compel (R. Doc. 213); and finally,

- Plaintiffs' Motions to Compel (R. Docs. 252, 253, 254, 255, 256) the various Defendants to respond to Requests for Production and Admission which largely concern the settlement of Shemika Robinson's lawsuit in Texas.

While this is a case for fraudulent concealment and bad faith in the handling of the two Plaintiffs' insurance claims, the car accident precipitating those claims actually injured four people. Two of them sustained bodily injuries and property damage—Plaintiff, Ted Blackmon, and non-party, Russell Koop. The 2 remaining victims unfortunately passed away—Khance

Blackmon, the son of Ted Blackmon, whose estate is represented in this lawsuit by Plaintiff Ruthie Blackmon; and Shemika Robinson, Khance's mother. Insurance claims were filed by or on behalf of all 4 victims.

The outcome of each pending discovery Motion will, at least in part, depend on whether information related to the handling and eventual settlement of a non-party victim's claim falls within the scope of permissible discovery. For that reason, the Court considers all 8 Motions at the same time, resolving them below. (R. Docs. 213, 237, 244, 252-256). The Court has bifurcated "trial and discovery of Plaintiffs' fraud and rescission claims from trial and discovery of Plaintiffs' accident-related negligence claims." (R. Doc. 139 at 5). Discovery is currently proceeding on Plaintiffs' fraud and rescission claims, while all other discovery remains stayed. (R. Doc. 139 at 5).

I.      FACTUAL BACKGROUND

In 2016, Jhon Jaramillo was a dual employee of 2 related companies, C3 Construction Services, Inc. and Bracken Construction. (R. Doc. 79 at 5). On June 15, 2016, Jhon Jaramillo drove a Ford F350 owned by C3 from Mississippi to Alabama, while in the course and scope of his employment with Bracken Construction. (R. Doc. 79 at 7). Near Mobile, Alabama, Jaramillo caused a head-on collision while attempting to pass the car in front of him. (R. Doc. 79-1). Jaramillo collided head on with a vehicle driven by Ted Blackmon, killing Blackmon's 2 passengers—Shemika Robinson and their 3-year-old son, Khance Blackmon. (R. Doc. 79-2 at 7). The driver of the car Jaramillo attempted to pass, Russell Koop, was also injured. (R. Doc. 79-1 at 3).

C3 carried a $1 million auto policy issued by Charter Oak Fire Insurance Company (Charter Oak). (R. Doc. 79-3). Bracken Construction carried a $1 million liability policy issued by

Travelers Property Casualty Company (Travelers Property), and a $10 million excess policy issued by Travelers Excess and Surplus Lines Company (Travelers Excess). (R. Doc. 79 at 22).

Anthony Ver Meer was assigned by Charter Oak to adjust the claim under the $1 million policy issued on behalf of C3 Construction. He contacted the victims of the accident in July of 2016, informing them of C3's Policy and its $1 million limit. (R. Doc. 79-3). In August of 2016, Ver Meer realized that Jaramillo was likely in the course and scope of his employment with Bracken at the time of the accident, making the additional $11 million in coverage under Bracken's Policies potentially available. According to Ver Meer, he notified Ted Blackmon, Shemika Robinson's mother, and Russell Koop's attorney by certified letter on August 23, 2016. (R. Doc. 182 at 4).

The letter identified and included contact information for both Matt Willson, the adjuster for Travelers who would be handling the claim, and James Holland, the attorney for Bracken. (R. Doc. 88-6).

Ted Blackmon claims he never got the August 23, 2016 letter and that he and his mother, Ruthie Blackmon, the representative of Khance's estate, were fraudulently induced into settling Khance's wrongful death claim for well below what it was worth on October 19, 2017. (R. Doc. 79 at 18, 26, 28); (R. Doc. 88-18). Ver Meer claims he had multiple discussions with Ted Blackmon about the additional coverage but that Mr. Blackmon was having financial trouble, making him desperate for a quick settlement. (R. Doc. 182 at 4-6). Matt Willson also claims that Mr. Blackmon called him on his direct line after receiving the letter and that he had multiple phone calls with Blackmon about the additional coverage available under the Bracken policies. (R. Doc. 145-2). Defendants later obtained Mr. Blackmon's phone records during discovery,[1] which

---

[1] Matt Willson claims that Ted Blackmon called him on September 2, 2016, and again on October 4, 2016. (R. Doc. 145-2 at 2, 3). However, only one of those calls is corroborated by Mr. Blackmon's phone records because the Court

indicate that Mr. Blackmon placed calls to both Matt Willson and James Holland (Bracken's attorney) on September 2, 2016. (R. Doc. 258 at 2-3); (R. Doc. 258-6) (Ted Blackmon's phone records); (R. Doc. 258-8) (Holland's phone records).

On January 11, 2018, Ted and Ruthie Blackmon filed this lawsuit against Bracken Construction Company, C3 Construction Services, Jhon Jaramillo, the Charter Oak Fire Insurance Company, Travelers Property Casualty Company of America and Travelers Excess and Surplus Lines Company. Relevant here, Ted and Ruthie Blackmon claim Defendants fraudulently induced them into settling the claims of both Ted Blackmon and the estate of Khance Blackmon and are liable for: insurance bad faith and unfair settlement practices under the laws of Louisiana and Florida; equitable estoppel; unjust enrichment; detrimental reliance and promissory estoppel; and "failure/lack of cause and/or consideration." (R. Doc. 79). Plaintiffs also seek rescission of both settlement agreements due to error or mistake of fact and have filed personal injury claims arising out of the accident. (R. Doc. 79).

**A.     Plaintiffs' Motion to Compel (R. Doc. 213)**

During discovery, on May 13, 2019, Plaintiffs sent Requests for Admission, Interrogatories, and Requests for Production to the Insurer Defendants: Anthony Ver Meer,[2] Charter Oak Fire Insurance Company, Travelers Property Casualty Company of America, and Travelers Excess and Surplus Lines Company. (R. Doc. 237-4). In response, the Insurer Defendants objected to most of Plaintiffs' written discovery and provided a 758-page privilege log. (R. Docs. 213-3 and 213-4). When the parties were unable to resolve their issues over the withheld information, Plaintiffs filed the instant Motion to Compel. (R. Doc. 213). There are 2

---

limited discovery to Mr. Blackmon's "outgoing and incoming calls and text messages involving Mr. Ver Meer and/or Mr. Willson from August 23, 2016 through September 30, 2016." (R. Doc. 236 at 6).

[2] Anthony Ver Meer was not, however, included in the Motion to Compel. (R. Doc. 213).

main issues: (1) the number of interrogatories propounded by Plaintiff and (2) Defendants' refusal

to provide certain information, including the majority of their respective claim files. (Defs.' Opp'n,

R. Doc. 231); (Pls.' Reply, R. Doc. 242); (Defs.' Supplemental Opp'n, R. Doc. 238-1). Plaintiffs

propounded 20 Interrogatories. (R. Doc. 237-4). However, Defendants only answered the first 16,

claiming the limit had been met based on the number of discrete subparts included in Plaintiffs'

requests. (R. Doc. 213-3). As for the information requested, the Insurer Defendants have withheld

much of their claim files as privileged and refused to provide other information (e.g., employee

manuals, employee incentive programs, personnel files) because they claim the information is

either privileged, irrelevant, or both.

**B.      Plaintiffs' Motion for Leave to Propound Additional Interrogatories**

Shortly after filing their Motion to Compel, Plaintiffs learned that the estate of Shemika

Robinson had settled its Texas lawsuit against Bracken, C3, and Jaramillo for her wrongful death.

Wishing to obtain information about the settlement but anticipating Defendants would object that

Plaintiffs had already served over 25 interrogatories, Plaintiffs filed a Motion for Leave (R. Doc.

237) to propound additional interrogatories about the settlement. Defendants object that the

information is confidential, not admissible, and irrelevant. (R. Doc. 243).

**C.      Insurer Defendants' Motion for Protective Order**

Although it had already filed an Opposition (R. Doc. 231, 238-1) to Plaintiffs' Motion to

Compel (R. Doc. 213), the Insurer Defendants later moved the Court for a protective order stating

they did not owe any further responses. (R. Doc. 244). In other words, the Insurer Defendants filed

what amounts to a second opposition. In the alternative, they ask that the Court conduct an in-

camera review of the documents they withheld as privileged, which are at issue in Plaintiffs' earlier

Motion to Compel (R. Doc. 213). The Court notes that the Insurer Defendants' privilege log is 758 pages long. (R. Doc. 213-3). Plaintiffs object to the Motion as untimely.

### D.     Plaintiffs' Motions to Compel (R. Doc. 252-256)

Although they had already moved the Court for leave to serve additional interrogatories related to Ms. Robinson's settlement, Plaintiffs nonetheless served Requests for Production on the various Defendants seeking documents related to the negotiation and settlement of Ms. Robinson's lawsuit in Texas. (R. Docs. 252-256). When the various Defendants objected to the production as irrelevant, inadmissible, and confidential, Plaintiffs filed 5 separate Motions to Compel (R. Doc. 252-256). Also at issue are the sufficiency of the Defendants' responses to certain Requests for Admission. (R. Docs. 252-256).

## II.     LEGAL STANDARD

Rule 26(b)(1) of the Federal Rules of Civil Procedure permits discovery of "any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering," among other things, "the importance of the discovery in resolving the issues, and whether the burden or expense . . . outweighs its likely benefit." In terms of relevance, "information within this scope of discovery need not be admissible in evidence to be discoverable." Fed. R. Civ. P. 26(b)(1). The scope of discovery is not without limits, however, and the court may protect a party from responding to discovery that is unreasonable or outside the scope permitted by Rule 26(b)(1). *See* Fed. R. Civ. P. 26(b)(2). A party may also withhold information that would be otherwise discoverable on the basis of privilege, Fed. R. Civ. P. 26(b)(1), but it must expressly make the claim and describe the nature of the document being withheld, Fed. R. Civ. P. 26(b)(5). But ultimately, the scope of discovery is within the sound discretion of the trial court. *E.g.,*

*Quintero v. Klaveness Ship Lines*, 914 F.2d 717, 724 (5th Cir. 1990) ("the district court has wide discretion in determining the scope and effect of discovery").

## III.    DISCUSSION

The Court will first consider Defendants' Motion for Protective Order (R. Doc. 244), before moving to the number of interrogatories propounded by Plaintiffs (R. Doc. 213), as well as their request for leave to exceed the 25 interrogatory limit (R. Doc. 237), before turning to the discoverability of information related to the other accident victims, followed by the remaining discovery at issue in Plaintiffs' numerous Motions to Compel. (R. Doc. 213, 252-256).

### A.    Insurer Defendants' Motion for Protective Order

Plaintiffs served the discovery at issue in their earlier Motion to Compel (R. Doc. 213) on May 13, 2019 (R. Doc. 237-4), and the Insurer Defendants responded on July 12, 2019 (R. Doc. 213-2). Following the parties' attempts to confer, Plaintiffs moved to compel the Insurer Defendants' responses to their discovery on October 9, 2019. (R. Doc. 213). And while the Insurer Defendants submitted their Opposition on November 1, 2019 (R. Doc. 231), they later filed a Motion for Protective Order or Request for In-Camera Review on December 16, 2019 (R. Doc. 244). In their Motion for Protective Order, the Insurer Defendants "seek a protective order ruling that they owe no further response to the Interrogatories, Requests for Production and Requests for Admissions propounded by plaintiffs" on May 13, 2019 (R. Doc. 244 at 1)—the same discovery requests at issue in Plaintiffs' earlier Motion to Compel (R. Doc. 213). In the alternative, the Insurer Defendants ask the Court to conduct a blanket in-camera review of the documents at issue before ordering production.

"The court may, for good cause, issue an order to protect a party or person from annoyance,

embarrassment, oppression, or undue burden or expense." Fed. R. Civ. P. 26(c)(1); *see also Wilkerson v. Stalder*, 2015 WL 22366417, at *3 (M.D. La. May 12, 2015) (protective order may be issued on a showing of good cause). While Rule 26(c) does not specify a timeframe, usually a motion for protective order is timely if filed before the responses to discovery are due, unless good cause is shown for a later filing. *See Maxey v. General Motors Corp.*, 1996 WL 692222, at *1 (N.D. Miss. Nov. 18, 1996). But absent extraordinary circumstances, the "outside limit" for seeking a protective order is typically the deadline for responding to a motion to compel the discovery at issue. *See Brittain v. Stroh Brewery Co.*, 136 F.R.D. 408, 414 (M.D.N.C. 1991); *Lexington Ins. Co. v. Swanson*, 2007 WL 1287938, at *2 (W.D. Wash. May 1, 2007) ("Absent extraordinary circumstances, the outside limit within which a motion for a protective order for written discovery may be made is the time set for the response to a motion to compel written discovery."); *SMA Portfolio Owner, LLC v. Corporex Realty & Investment, LLC*, 2014 WL 12650589, at *2 (E.D. Ky. April 18, 2014) ("[N]umerous courts have held that a party *must* file a motion for protective order by the deadline for responding to a discovery request and/or responding to a motion to compel.").

Here, the Insurer Defendants responded to discovery on July 12, 2019 (R. Doc. 213-2), and they opposed the eventual Motion to Compel on November 1, 2019. (R. Doc. 231). Under the circumstances, their Motion for Protective Order filed on December 16, 2019 (R. Doc. 244), is clearly untimely. The Insurer Defendants have shown no extraordinary circumstances to warrant the Court's consideration of their untimely Motion (R. Doc. 244), and it must therefore be **DENIED**.

Beyond that, the Insurer Defendants' request for a "protective order ruling that they owe no further response to the Interrogatories, Requests for Production and Requests for Admissions

propounded by plaintiffs" on May 13, 2019 (R. Doc. 244 at 1), is wholly redundant with their Opposition (R. Doc. 231) to Plaintiffs' Motion to Compel. In other words, the Motion for Protective Order is unnecessary as the Insurer Defendants already preserved their objections to Plaintiffs' written discovery in their Opposition (R. Doc. 231) to the Motion to Compel (R. Doc. 213). *See Lopez v. Don Herring Ltd.*, 327 F.R.D. 567, 583 (N.D. Tex. 2018) ("[T]he party who has objected to a discovery request then must, in response to a Rule 37(a) motion to compel or in support of its own . . . motion for a protective order, urge and argue in support of its objection . . . and, if it does not, it waives the objection."). Therefore, the Insurer Defendants will not be prejudiced by the Court's refusal to consider their untimely Motion.

Finally, the Insurer Defendants' alternative request for an in-camera review of the documents identified in their privilege log is **DENIED** as untimely for the same reasons given above. Beyond that, the privilege log submitted by the Insurer Defendants is itself 758 pages long. (R. Doc. 213-3). Elsewhere in the record, the Insurer Defendants indicate that the documents being withheld total over 10,000 pages. (R. Doc. 213-2 at 44). Despite all this, Defendants have not identified or provided any specific documents for in-camera review. (R. Doc. 244) (requesting instead that the Court review any documents in-camera before ordering production). As such, their request could seemingly apply to all the documents listed on their privilege log, placing a significant strain on this Court's resources without any justification by the Insurer Defendants.[3]

Defendants bear the burden of showing that they properly withheld documents based on the asserted privileges. In camera review is "not to be used as a substitute for a party's obligation to justify its withholding of documents" and it "should not replace the effective adversarial testing of the claimed privileges and protections." *Diamond State Ins. Co. v. Rebel Oil Co., Inc.*, 157

---

[3] If the Court identifies any document(s) that it feels might warrant in-camera review, it will do so. But it will not undertake the seemingly wholesale review requested by the Insurer Defendants.

F.R.D. 691, 700 (D. Nev. 1994). The Court will not undertake a review of potentially thousands of pages of withheld documents without any meaningful justification by the Insurer Defendants. *See United States v. Zolin*, 491 U.S. 554, 571 (1989) ("[W]e cannot ignore the burdens in camera review places upon the district courts, which may well be required to evaluate large evidentiary records without open adversarial guidance by the parties."); *Smith v. Shelter Mut. Ins. Co.*, 2018 WL 1278429, at *2 (M.D. La. Mar. 12, 2018) (refusing to conduct blanket review of 139 withheld documents, as it "would constitute a great and unnecessary expenditure of judicial resources").

Also significant, the Motion for Protective Order does not provide any additional information that might aid in the Court's privilege determination. As discussed later, the Insurer Defendants have not provided sufficient evidence or information to substantiate their privilege claims in connection with Plaintiffs' Motion to Compel (R. Doc. 213). And although they took another bite at the apple when filing this Motion for Protective Order, the Insurer Defendants made no further effort to show they properly withheld thousands of documents as privileged.

For the reasons given above, the Insurer Defendants' Motion for Protective Order (R. Doc. 244) is **DENIED**.

### B.    Number of Interrogatories

Plaintiffs' May 13, 2019 discovery requests to the Insurer Defendants, which are at issue in their earlier Motion to Compel (R. Doc. 213), included 20 Interrogatories. (R. Doc. 237-4) (the same interrogatories were served by both Plaintiffs on each of the Insurer Defendants). The Insurer Defendants objected to the interrogatories as exceeding the 25 interrogatory limit imposed under Rule 33 of the Federal Rules of Civil Procedure. (R. Doc. 213-2). Because they believed Plaintiffs had exceeded the number allowed, the Insurer Defendants only answered up to Interrogatory No. 16, explaining:

**Answer to Interrogatory No. 16:**
. . . Although labeled "Interrogatory No. 16", Interrogatory No. 16 subparts (a) through (f) contain, at a minimum, 7 different interrogatories for purposes of FRCP 33(a)(1) thereby bringing the total number of interrogatories up to 50 for purposes of FRCP 33(a)(1). [The Insurer Defendants] have each now responded to more than fifty interrogatories propounded by Ted Blackmon as well as fifty interrogatories propounded by Ruthie Blackmon.[4] Pursuant to FRCP 33(a), not more than 25 written interrogatories, including all discrete subparts, may be served . . . . Because both Ted Blackmon and Ruthie Blackmon have violated FRCP 33(a) . . . no further interrogatory is required to be answered.

(R. Doc. 213-2 at 58-59). While Plaintiffs disagree that they exceeded the number of interrogatories allowed in their May 13, 2019 discovery requests, in the event the Court agrees with the Insurer Defendants, they have sought leave of Court to propound additional interrogatories concerning the 2019 settlement of Shemika Robinson's lawsuit. (R. Doc. 237). Before considering Plaintiffs' request to propound additional interrogatories, the Court must first consider whether they have already exceeded the number allowed by the Federal Rules of Civil Procedure.

Rule 33(a)(1) provides that "[u]nless otherwise stipulated or ordered by the court, a party may serve on any other party no more than 25 written interrogatories, including all discrete subparts." The comments to Rule 33(a)(1) explain:

Parties cannot evade this presumptive limitation through the device of joining as 'subparts' questions that seek information about discrete separate subjects. However, a question asking about communications of a particular type should be treated as a single interrogatory even though it requests that the time, place, persons present, and contents be stated separately for each such communication.

Fed. R. Civ. P. 33(a)(1) advisory committee's notes (1993). In deciding whether subparts should be considered separate interrogatories, courts consider "whether the interrogatory subparts are

---

[4] It remains unclear why the Insurer Defendants were each willing to answer up to fifty interrogatories from *each* Plaintiff, when each Plaintiff is only permitted twenty-five.

logically or factually subsumed within and necessarily related to the primary interrogatory question." *Estate of Manship v. United States*, 232 F.R.D. 552, 554 (M.D. La. 2005).

The Court has reviewed Plaintiffs' Interrogatories and finds them to be an excessive use of the discovery device. (R. Doc. 213-2). While the Court will not spend time analyzing each individual Interrogatory, it notes that just Interrogatory No. 12 includes, at a minimum,18 separate Interrogatories:

> **Interrogatory No. 12:**
> With regards to the Requests for Admission which have been served on you, to the extent that any of your responses to any of Plaintiffs' Requests for Admission is other than an unqualified admission:
> a)    State exactly why such statement is incorrect;
> b)    Provide the correct version of the denied facts;
> c)    State what part, if any, of the statement is correct;
> d)    Identify each and every document that supports your denial;
> e)    List all facts upon which you based any part of your response, identify all documents memorializing each such fact, and identify all persons with knowledge of each such fact; and
> f)    Provide the names, addresses, telephone numbers, and titles of any and all individuals who you believe will support your denial of the requests.

(R. Doc. 213-2 at 45-46). "[I]n the context of interrogatories that seek additional information regarding a party's denials of requests for admission," like Interrogatory No. 12, "there is a robust consensus that each request for admission constitutes a discrete subpart and a separate interrogatory." *Superior Sales West, Inc. v. Gonzalez*, 335 F.R.D. 98, 104 (W.D. Tex. 2020) (collecting cases). Here, Plaintiffs propounded 18 Requests for Admission, bringing the total number of Interrogatories contained within Interrogatory No. 12 to 18, assuming subparts (a) through (f) are not considered discrete subparts, as well. Even if each remaining Interrogatory only counted as one, the 25-limit would be met before Interrogatory No. 12 could be answered in full.

By answering up to Interrogatory No. 16, the Insurer Defendants did more than was required, and the Court will therefore sustain Defendants' objections to Interrogatory Nos. 17-20.

Plaintiffs' earlier Motion to Compel (R. Doc. 213) is therefore **DENIED** to the extent they seek responses from the Insurer Defendants to **Interrogatory Nos. 17-20**.

### C.     Leave to Propound Additional Interrogatories

Plaintiffs filed a Motion for Leave to Propound Additional Interrogatories (R. Doc. 237) on all Defendants—5 new interrogatories on the Insurer Defendants (R. Doc. 237-2) and 3 on the Insured Defendants (R. Doc. 237-3). Plaintiffs' proposed interrogatories relate to the negotiation and settlement of the various accident victims' claims, focusing primarily on the claims arising out of Shemika Robinson's death. (R. Docs. 237-2 and 237-3).

Where a party seeks leave to serve more than 25 interrogatories, leave "may be granted to the extent consistent with Rule 26(b)(1) and (2)." Fed. R. Civ. P. 33(a)(1) (limiting parties to 25 interrogatories); *Estate of Manship v. United States*, 232 F.R.D. 552, 559 (M.D. La. 2005) ("[A] court is to determine whether the interrogatory limit may be exceeded by examining the circumstances of the case under the factors listed in [Rule] 26(b)(2)."). While Rule 26(b)(1) generally allows for "[proportional] discovery regarding any nonprivileged matter that is relevant to any party's claim or defense," relevant here, Rule 26(b)(2) instructs that discovery should be limited when it "is unreasonably cumulative or duplicative" Fed. R. Civ. P. 26(b)(2)(C)(i). With that in mind, courts have found the "numerical limit on interrogatories is intended to protect against potentially excessive use of interrogatories, not to prevent necessary discovery." *Lower River Marine, Inc. v. USL-497 Barge*, 2007 WL 4590095, at \*2 (E.D. La. Dec. 21, 2007). And so, the outcome often depends on whether "the requesting party has adequately shown that the benefits of additional interrogatories outweigh the burden to the opposing party." *Manship*, 232 F.R.D. at 559. Here, Plaintiffs have not made that showing.

Putting aside the relevance and discoverability of the settlement information sought,[5] the Court finds Plaintiffs' Motion for Leave must be denied as the additional discovery is needlessly redundant. (R. Doc. 237). For example, the proposed interrogatories to the Insurer Defendants generally request information related to the assessment, negotiation, and ultimate settlement for the claim brought by Shemika Robinson's estate, as well as any other claimant:

**Interrogatory No. 22:**
Identify each and every oral and/or written offer of settlement and/or compromise made by you to any claimant . . . for any claims, causes of action, or theories of liability related to the June 15, 2016 collision (including . . . Shemika Robinson), and include in your response the identity of the claimant and/or legal representative to whom the offer was made or from whom the offer was received; the persons involved in exchanging the offer; the date the offer was exchanged; and the disposition of such offer . . . .

**Interrogatory No. 23:**
Identify each and every settlement agreement and/or compromise agreement entered into by you for any and all claims, causes of action, or theories of liability related to the June 15, 2016 collision (including . . . the wrongful death of Shemika Robinson), and include in your response the parties entering into the agreement, each person involved in negotiating the agreement, the date the agreement was executed, and the consideration paid by you under the agreement.

**Interrogatory No. 25:**
Identify each and every one of the "settlements and verdicts in litigated claims" that you "looked at," as referenced in Paragraph 28 of the "Declaration of Anthony Ver Meer . . . and also identify any and all other documents and information that you reviewed or considered in your evaluation of the settlement and/or litigation value of the claims of the Estate of Khance Blackmon . . . .

(R. Doc. 237-2 at 7-8) (R. Doc. 237-3) (proposing nearly identical interrogatories to propound on the Insured Defendants). The same information has already been requested multiple times in discovery and is, at this point, bordering on an abuse of the discovery process:

**Interrogatory No. 4:**
Please identify each and every claim related to the collision, including the date the claim was submitted, the claim number, the policy or policies under which the claim was submitted, dates and amounts of all offers to settle by any party, and the

---

[5] The Court addresses the relevance and discoverability of Ms. Robinson's settlement later on in this Order.

disposition of the claim and whether the claim was handled by you or you were otherwise engaged in the negotiation and/or resolution of that claim.

**Request for Production No. 13:**
Please provide copies of all documents related to settlement of Plaintiffs' claims related to the collision, including but not limited to documents stating or estimating the Insurers' or the Insureds' exposure and/or the extent of Plaintiffs' damages; coverage opinions, internal memoranda, or communications related to settlement; documents (including communications) exchanged with any Plaintiff, Defendant, or third party related to settlement; and any and all other documents that you reviewed, relied upon, created, or received in determining whether and for what amounts to settle with Plaintiffs.

**Request for Production No. 19:**
Please provide copies of any and all notes, documents, or information related to the evaluation, analysis, and estimates of potential exposure for any and all claim(s) related to the collision, including the risks of exposure in excess of $1,000,000.00.

(R. Doc. 213-2 at 12-13, 77).

**Request for Production No. 47:**
Produce a copy of the settlement agreement executed by the parties in the matter captioned *Alfredia Robinson, Individually and as Representative of Shemika Robinson, Deceased v. C3 Construction Services, Inc., et al*., in the 164th District Court, Harris County, Texas, along with any and all documents referenced in or attached to that agreement.

**Request for Production No. 48:**
Produce any and all correspondence related to settlement; logs and/or recordation of any oral or written communications relating to settlement; copies of any and all documents relating to final or proposed settlements; copies of any proposed or final receipt and release documents; and copies of any and all documents relating to any preliminary or proposed offers of compromise and/or settlement . . . which were exchanged between and/or shared with anyone other than your attorneys related to the matter . . . of *Shemika Robinson, Deceased v. C3 Construction Services, Inc., et al*. . . . .

**Request for Production No. 49:**
Produce any and all documents considered or reviewed by you in evaluating your potential exposure for, settlement value of, and/or litigation value of claims asserted in the matter . . . of *Shemika Robinson, Deceased v. C3 Construction Services, Inc., et al*., . . . including but not limited to settlements, verdicts in litigated cases, statutes, jurisprudence, articles and treatises, quantum analyses, and other similar reference materials.

(R. Doc. 253-4 at 5). The Court has reviewed Plaintiffs' numerous and extensive discovery requests and finds the additional interrogatories proposed by Plaintiffs are all redundant. *Freedom Found. v. Sacks*, 2020 WL 1914902, at *3 (W.D. Wash. Apr. 20, 2020) (denying request to propound additional interrogatories in a case with multiple defendants; "There is no need to waste more time, effort, and paper just so Normoyle and Smith can repeat the same information again."). Therefore, Plaintiffs cannot show that any added benefit of these requests outweighs the extensive burden already placed on their opponents in discovery. Plaintiffs' Motion for Leave to Propound Additional Interrogatories (R. Doc. 237) is therefore **DENIED**.

### D.    Claim File Materials

The June 15, 2016 accident resulted in injuries and property damage for Ted Blackmon and Russell Koop and unfortunately claimed the lives of Shemika Robinson and Khance Blackmon. Three insurance policies potentially provided coverage—C3's $1 million auto policy issued by Charter Oak, Bracken's $1 million liability policy issued by Travelers, and Bracken's $10 million umbrella policy issued by Travelers Excess. After claims were filed by or on behalf of all 4 accident victims, 3 claim files were created, one for each policy. The claim file created for each policy contains information related to all 4 accident victims. A fourth and fifth claim file were also created under C3's policy—the fourth for the defense of Bracken and the fifth for the defense of Jhon Jaramillo.[6] (Insurer Defs.' Answer to Interrog. No. 4, R. Doc. 213-2 at 13).

---

[6] The Insurer Defendants' Answer to Interrogatory No. 4 explained that 5 claim files, each with their own claim number, were associated with the June 15, 2016 accident:

      (1) Claim No. E7Q2165   C3 Construction's auto policy (assigned to Anthony Ver Meer)
      (2) Claim No. E7Q7052   Bracken's liability policy (assigned to Matt Willson then Melanie Ivanis)
      (3) Claim No. CDP8822   Bracken's umbrella policy (assigned to Willson then Ivanis)
      (4) Claim No. E8M9814   Bracken's defense under C3's policy (assigned to Willson then Ivanis)
      (5) Claim No. A3A0480   Jaramillo's defense under C3's policy (assigned to Kimberly Ridling).

(R. Doc. 213-2 at 13).

In their earlier Motion to Compel (R. Docs. 213), Plaintiffs seek production of all the materials found in the claim files associated with the collision, including claim log notes, communications, investigations, facts about the accident, memoranda, assessments of exposure and liability, and settlements, among other things. (R. Doc. 213-1 at 19-29).[7] To be clear, Plaintiffs' requests are not limited to the claims of Ted Blackmon or the estate of Khance Blackmon, but instead seek information relating to all 4 accident victims. At issue are Request for Production Nos. 8, 9, 12, 15, 17, 18, 20, 21, 22, 23, 25, 26, and 29. (R. Doc. 213-2). Before addressing the discoverability of claim file materials, the Court must first address the scope of these 13 Requests for Production.

Although Plaintiffs have identified 13 Requests for Production as seeking information in the Insurer Defendants' claim files, the majority of those requests are not so limited. Based on the Court's review, 10 of the Requests for Production included in the 'claim file' category are not at all limited to materials in the claim files—Request for Production Nos. 12, 17, 18, 20, 21, 22, 23, 25, 26, and 29. In fact, these requests have no temporal limit and are not actually limited to the claims arising out of the June 15, 2016 accident. For example:

> **Request for Production No. 12:**
> Please provide all communications, including memoranda, e-mails, letters, other written and electronic communications, and recordings, notes, or logs of telephone conversations between or among you and any Plaintiff, Defendant, or third party, that is related to the handling of the claim(s) arising from the collision and/or any and all issues raised in the Complaint.

> **Request for Production No. 17:**
> Please provide copies of each and every document identified in the accompanying Interrogatories and which has not been produced in response to any other request, including but not limited to copies of all Claims File(s) or other files by any name maintained by any Defendant or any related parties, including its home office,

---

[7] Although not specifically referenced, the Court has reviewed and considered the Declaration of Louis G. Fey (R. Doc. 213-9), later submitted as Exhibit H to Plaintiffs' earlier Motion to Compel (R. Docs. 226, 227), as well as the Insurer Defendants' response to Mr. Fey's Declaration (R. Doc. 238).

regional office, local office, or any other offices, involving the June 15, 2016
collision or other claims asserted in this litigation.

**Request for Production No. 20:**
Please provide copies of any and all documents and communications, including
memoranda, e-mails, letters, other written and electronic communications;
recordings, notes, or logs of telephone conversations; and any notes or other
documents memorializing or related to oral or written communications or
conversations, from Anthony Ver Meer, Matt Willson, and/or Milena Ivanis that
were sent directly to and/or which copied any of the Insureds.

(R. Doc. 213-2 at 76, 82, 92-93). As written, privileged documents and communications related to

the defense of this litigation, as well as the litigation filed on behalf of Shemika Robinson's estate,

would reasonably fall within the scope of these Requests. Indeed, Request for Production No. 17

would include the litigation files of counsel. Beyond that, Request for Production No. 20 is not

only unlimited in time, it is not even limited to the June 15, 2016 accident. Defendants objected to

the requests as overbroad and seeking information that was irrelevant or protected from discovery

by both the attorney-client privilege and work product doctrine. (R. Doc. 213-2).

Despite this and the "affirmative duty" imposed by Rule 26(g) to avoid discovery abuse,

Plaintiffs did not narrow the scope of requested materials, even after the Insurer Defendants

objected. Fed. R. Civ. P. 26(g) advisory committee's notes (1983) ("Rule 26(g) imposes an

affirmative duty to engage in pretrial discovery in a responsible manner" and "is designed to curb

discovery abuse . . . by imposing a certification requirement that obliges each attorney to stop and

think about the legitimacy of a discovery request . . . ."). Indeed, "[t]he parties and the court have

a collective responsibility to consider the proportionality of all discovery and consider it in

resolving discovery disputes." Fed. R. Civ. P. 26(b) advisory committee's notes (2015). Plaintiffs

have consistently shirked this responsibility.

If materials within the claim files are what is at issue in Request for Production Nos. 12,

17, 18, 20, 21, 22, 23, 25, 26 and 29, as Plaintiffs represent, the Court finds them both redundant

and excessive, in addition to being overbroad. Request for Production Nos. 8, 9, and 15 already seek information found in the Insurer Defendants' claim files. Plaintiffs' earlier Motion to Compel (R. Doc. 213) is therefore **DENIED** as to **Request for Production Nos. 12, 17, 18, 20, 21, 22, 23, 25, 26, and 29**.

The remaining discovery at issue—Request for Production Nos. 8, 9, and 15—are more reasonably tailored and ask the Insurer Defendants to provide the following information from every claim file associated with the accident: "each and every note," (Request for Produc. No. 8, R. Doc. 213-2 at 71); "each and every page," (Request for Produc. No. 9, R. Doc. 213-2 at 72); and "all . . . communications" or "documents memorializing . . . communications . . . between [the Insurer Defendants] and any individuals . . . acting on behalf of Plaintiffs, including" their former counsel (Austin Ward, Scott Barnes or Nick Medley). (Request for Produc. No. 15, R. Doc. 213-2 at 79-80).

The information maintained in the 5 claim files, however, goes far beyond the permissible scope of discovery. Based on the Court's review of the privilege log (R. Doc. 213-3), the claim files include communications about Ms. Robinson's lawsuit between counsel of record and their clients, including litigation strategies, litigation expenses and legal billing; communications related to this litigation; medical and other personal records of the 4 accident victims; personal information about Jhon Jaramillo; documents related to Jaramillo's criminal case; and criminal records of non-parties, among other things. (R. Doc. 213-3 at 5, 8, 9, 186, 207, 208, 300, 302, 316, 320, 324, 340, 345, 349, 358, 367, 383, 513, 528, 602, 640, 743).

Considering the amount and types of information the files contain, the Insurer Defendants objected to Plaintiffs' requests to produce their complete claim files. For many documents— including those related to the facts of the accident, information about the other victims or Jhon

Jaramillo, and documents filed in the Robinson litigation—Defendants objected that these were beyond the scope of Phase I (fraud and rescission claims) discovery. (R. Doc. 213-1 at 19-30); (R. Doc. 231 at 17-18). For any information or communications exchanged between attorneys, the insurers, or the insureds, Defendants claimed the attorney-client privilege and work product, as well as a joint defense privilege. And for any claim log notes, coverage opinions, liability assessments, potential exposure memos, valuations, and the like, Defendants resisted production based on work product and often the attorney-client privilege.

With the parties at an impasse, the Court must first define the scope of discoverable materials contained in the claim files. Once that scope is assessed, the Court must consider whether Defendants have met their burden of establishing the asserted privileges. If they have, the Court must then decide whether any waiver has occurred.

### i.    Claim File Materials – Scope of Discovery

The crux of this litigation is the alleged fraudulent misrepresentation of available coverage. To establish fraud, Plaintiffs must show "a misrepresentation . . . with the intention [] to obtain an unjust advantage . . . ." *Lomont v. Bennett*, 172 So. 3d 620, 629 (La. 2015). However, "fraud cannot be predicated upon mistake or negligence." *Sanga v. Perdomo*, 167 So. 3d 818, 821 (La. App. 5 Cir. 2014). With that in mind, the conduct of the Defendants in evaluating, adjusting, and eventually settling Plaintiffs' claims will not only be relevant, but will generally define the scope of discovery. And that conduct has already been outlined by Defendants, as discussed below.

First, in response to Interrogatory No. 9, the Insurer Defendants detail the steps taken by their adjusters, Ver Meer and Willson, in handling and ultimately settling the Blackmons' claims. (R. Doc. 213-2 at 20-43). In their Answer, the Insurer Defendants discuss Ver Meer and Willson's investigation of the claims, including the decision to disclose the Bracken Policies to the claimants.

(R. Doc. 213-2 at 25) ("[T]hrough continued investigation, Ver Meer learned that Jaramillo may have been in the course and scope of his employment with Bracken . . . ."). They also describe Ver Meer's steps in evaluating the claims and negotiating both settlements with the Blackmons. (R. Doc. 213-2 at 33) (Ver Meer "thought $500,000 was a reasonable offer based on research of verdicts and settlements of other, similar claims."); (R. Doc. 213-2 at 33) (Ver Meer left Mr. Blackmon a voicemail on January 13, 2017 "advising that given the complexity of the case involving the death of a minor, Charter Oak was investigating issues to determine whether it could issue such an advance prior to an estate being created."); (R. Doc. 213-2 at 34) (On "February 1, 2017, Ver Meer left a voicemail for Ted Blackmon . . . explaining that Travelers was working to ensure that it was proper to deal with Ted Blackmon alone."); (R. Doc. 213-2 at 34) (On "February 8, 2017, Ver Meer discussed . . . with his supervisor . . . that due to Florida estate law . . . it did not appear that settlement negotiations could be finalized until Khance Blackmon's estate was opened and a personal representative was designated.").

Beyond that, the Insurer Defendants detail certain conversations the adjusters had with Ted or Ruthie Blackmon, indicating Plaintiffs' knowledge of the Bracken Policies, including their limits. (R. Doc. 213-2 at 26-27) (Mr. Blackmon called Willson on September 2, 2016, and Ver Meer on September 7, 2016, and confirmed his receipt of the August 23, 2016 letter); (R. Doc. 213-2 at 33) (On January 10, 2017, Ver Meer offered $500,000 to settle the wrongful death claim, describing the offer as reasonable based on verdicts and settlements in similar claims); (R. Doc. 213-2 at 32-33) (On January 10, 2017, Ted Blackmon demanded $5-6 million from Ver Meer to settle his son's wrongful death claim and told Ver Meer to "tap into the other $1 million policy and $10 million policy"); (R. Doc. 213-2 at 34) (On February 8, 2017, Ver Meer and his supervisor discussed the need to open Khance Blackmon's estate under Florida law before a settlement could

be finalized); (R. Doc. 213-2 at 36) (On March 29, 2017, Mr. Blackmon told Ver Meer that he fired his counsel, who "said he was entitled to millions"; Mr. Blackmon was nonetheless ready to settle for $600,000, an amount he thought was reasonable); (R. Doc. 213-2 at 39) (On August 29, 2017, Ver Meer advised Ruthie Blackmon of the Bracken Policies and their amounts). In their remaining discovery responses, the Insurer Defendants consistently refer to their Answer to Interrogatory No. 9 and indicate they may rely on the information provided in that Answer to support their defense. (Resp. to Interrog. No. 12, R. Doc. 213-2 at 45-47).

Consistent with the Insurer Defendants' Answer to Interrogatory No. 9, the 2 primary adjusters, Anthony Ver Meer (Defendant) and Matt Willson (non-party), submitted Declarations containing "detailed description[s]" of the handling, assessment, and eventual settlement of Plaintiffs' claims. (Ver Meer Decl., R. Doc. 30-2 at 4); (Willson Decl., R. Doc. 145-2). Those Declarations describe conversations the adjusters had with each other, the various Defendants and their employees, as well as Plaintiffs and their attorneys, about coverage, the value of Khance Blackmon's wrongful death claim and settlement negotiations. (Willson Decl., R. Doc. 145-2 at 2) ("Mr. Blackmon advised that he called me as a result of receiving the [August 23, 2016] letter . . . ."); (Willson Decl., R. Doc. 154-2 at 3) ("I notified Anthony Ver Meer that I received a call from Ted Blackmon and that [he] indicated he received Anthony's letter . . . and that he would be handling the matter himself because he recently had a bad experience with an attorney . . . ."); (Willson Decl., R. Doc. 145-2 at 4) ("After being advised of Chris Bracken's position regarding the proposed settlement . . . ."); (Willson Decl., R. Doc. 145-2 at 4) ("Ver Meer advised me that he was working to assess the reasonableness of a [$600,000] settlement demand made by Mr. Blackmon . . . .").

The adjusters also describe certain steps they took in adjusting Plaintiffs' claims, including Ver Meer's determination that $500,000 or $550,000 was a fair settlement offer for Khance Blackmon's wrongful death claim, based on "other settlements and verdicts in litigated claims" and "our evaluation." (Ver Meer Decl., R. Doc. 30-2 at 6) ($550,000); (Answer to Interrog. No. 9, R. Doc. 213-2 at 33) ($500,000); (Willson Decl., R. Doc. 145-2 at 2) ("I was assigned this matter . . . after it was discovered that Jhon Jaramillo . . . may have been alleged to be in the course and scope of employment with Bracken . . . ."). In addition to the claim files, Plaintiffs are also seeking a response to Request for Production No. 24, which asks for "all documents supporting the specific factual statements made" in both Anthony Ver Meer and Matt Willson's Declarations. (R. Doc. 213-1 at 34) (Request for Produc. No. 24).

A careful review of the Insurer Defendants' 758-page privilege log indicates that the claim files contain contemporaneous documents that either support or relate to the factual statements made in their Answer to Interrogatory No. 9 and the Declarations of Ver Meer and Willson. (R. Doc. 213-3). The Court therefore finds that the scope of permissible discovery with respect to the claim files consists of materials that either relate to, reference, or support the statements made in the Insurer Defendants' Answer to Interrogatory No. 9 and the Declarations of Anthony Ver Meer and Matt Willson. To be clear, this includes, but is not limited to, the following claim file materials:[8]

- Materials[9] memorializing or relaying the substance of the conversations or events referenced in the Answer to Interrogatory No. 9 or the Declarations of Ver Meer and Willson. Specifically, this includes any contemporaneous claim log notes memorializing conversations or events. It also includes any updates Ver Meer or Willson sent to each

---

[8] The events described in the Insurer Defendants' Answer to Interrogatory No. 9 and the Declarations of Ver Meer and Willson are all limited to the time period between June 15, 2016 (accident), and October 19, 2017 (settlement of Khance Blackmon's claim). To be clear, the claim file materials falling within the scope of permissible discovery are limited to that time period, as well.

[9] 'Materials' include, but are not limited to, contemporaneous claim log notes, emails, or other communications, as well as reports, summaries, and memoranda.

other or the other Defendants (or a representative of a Defendant) apprising the recipient(s) of any referenced conversations or events;

- Materials related to the decision to disclose the Bracken Policies;

- Materials that suggest (or otherwise substantiate) Ted or Ruthie Blackmon's knowledge, or lack of knowledge, that the Bracken Policies existed;

- Materials related to the assessment and valuation of Ted Blackmon's personal injury and property damage claim;

- Materials related to the assessment and valuation of Khance Blackmon's wrongful death claim,[10] including the applicable state law, if a particular state's law was applied;

- Materials related to the need to open (or the opening of) Khance Blackmon's estate under Florida Law. This includes Defendants' knowledge of Ted Blackmon's criminal history and any impact it might have on his ability to serve as estate representative prior to August 28, 2017. (R. Doc. 213-2 at 38); (R. Doc. 30-2 at 5-6).

Unless otherwise provided in this Order,[11] the scope of discovery with respect to the claim files does not include documents relating to the adjustment and settlement of Russell Koop or Shemika Robinson's claims. First, those documents do not shed light on whether misrepresentations were made to the Blackmons in the adjustment of their claims. Second, Plaintiffs have not put forth any argument substantiating the relevancy or need for information related to Mr. Koop. And so, information related to Mr. Koop is not discoverable for this additional reason. Third, most of the information related to Ms. Robinson is privileged. Although both Ms. Robinson's estate and Mr. Koop retained counsel almost immediately after the accident, Defendants' privilege log indicates that Ms. Robinson's estate filed suit in Texas sometime in

---

[10] On January 10, 2017, and August 29, 2017, Ver Meer conveyed offers of either $500,000 or $550,000 to settle Khance Blackmon's wrongful death claim, presenting both offers as reasonable, based on his research of awards in similar cases (Ver Meer Decl., R. Doc. 30-2 at 6); (Answer to Interrog. No. 9, R. Doc. 213-2 at 33, 39). *See Cincinnati Ins. Co. v. Zurich Ins. Co.*, 198 F.R.D. 81, 87 (W.D.N.C. 2000) (insurer impliedly waived privilege as to both fact and opinion work product by offering its attorney's opinion as to settlement value of underlying case).

[11] *See infra* Part III.E (discovery related to assessment and valuation of Ms. Robinson's claim may be discoverable if certain conditions are met).

August of 2016—roughly 2 months after the accident. (R. Doc. 213-3 at 203-04, 308-10). Therefore, most of the materials related to Ms. Robinson are legitimately protected from production by the attorney-client privilege or the work product doctrine. *Netto v. Atl. Specialty Ins. Co.*, 2017 WL 4540963, at *2 (S.D. Miss. Oct. 11, 2017) ("The claim file notes . . . post-date the filing of Plaintiff's lawsuit and therefore are protected by attorney-client privilege and/or work product doctrine. . . . Moreover, all entries beginning with 4/13/2016 are in anticipation of litigation, because at this point ASIC had received a settlement demand from Plaintiff's counsel.").

And so, with the potential exception noted later in this Order, *see infra* Part III.E, the Court does not find any relevance that would place the claim file materials related to Ms. Robinson or Mr. Koop within the scope of discovery.

### ii.       Claim File Materials – Privilege

Having defined the scope of discovery with respect to the claim files, the Court must now consider whether any of those documents are privileged and, if so, whether a waiver has occurred. Defendants are attempting to withhold almost the entirety of their claim files, even those materials relevant to the Blackmons, by claiming they are subject to the attorney-client privilege, as well as the work product doctrine, as they anticipated litigation immediately after the accident, given the nature of the injuries involved and the fact that other claimants (Koop and Robinson) retained counsel almost immediately.

At the outset, the Court notes that the sheer volume of documents found in the claim files, coupled with the Insurer Defendants' failure to adequately describe the documents on their

privilege log,[12] or even identify which documents respond to each discovery request,[13] makes this assessment particularly difficult. *See Douga v. D & Boat Rentals, Inc.*, 2007 WL 1428678, at *4 (W.D. La. May 10, 2007) ("Numerous courts have noted the difficulty of determining the scope of work product privilege as it applies to insurance claims files or records from an insurer's investigation of an insured's claim."); *Victor Stanley, Inc. v. Creative Pipe, Inc.*, 250 F.R.D. 251, 254 n.2 (D. Md. 2008) ("[W]hen a party refuses to produce documents during discovery on the basis that they are privileged or protected, it has a duty to particularize that claim."); *Bowne of New York City, Inc. v. AmBase Corp.*, 150 F.R.D. 465, 475 (S.D.N.Y. 1993) ("There simply is not enough information supplied [on the privilege log] to support the privilege claims of AmBase with regard to its ["substantial volume of"] documents, particularly in the absence of any supporting evidence."). But ultimately, the difficulty of this task makes one thing clear—the Insurer Defendants have not met their burden of showing that the relevant claim file materials are protected from disclosure by either the attorney client privilege or the work product doctrine.[14]

---

[12] Indeed, for many entries, the Insurer Defendants fail to indicate which claimant the communication relates to, making it impossible to assess the privilege. (R. Doc. 213-3 at 380) ("7/28/2016 Email (summary of facts and coverage issues; additional information needed."); (R. Doc. 213-3 at 383) ("1/10/2017 Email (strategy for settlement negotiations"); (R. Doc. 213-3 at 386) ("1/3/2017 Email (update on status of claims, settlement strategy"). This is especially true where certain claims were in litigation, while others were not.

[13] In their written discovery responses, the Insurer Defendants do not identify which documents on their privilege log are being withheld in response to each request. Instead, Defendants simply refer Plaintiffs to their entire privilege log. This practice is not only insufficient, *Orchestrate HR, Inc. v. Trombetta*, 178 F. Supp. 3d 476, 510 (N.D. Tex. 2016) ("It is Defendants' responsibility to provide meaningful responses to the requests for production, and it is Defendants' responsibility to review the voluminous documents to identify those that are responsive to specific requests."), it is especially problematic given the privilege log is 758 pages long and does not adequately describe the privileged nature of documents being withheld. *See* Fed. R. Civ. P. 26(b)(5); LR 26(c) ("description must include each requisite element of the privilege or protection asserted; date; author(s); recipient(s); and nature of the privilege."); *see also Cashman Equip. Corp. v. Rozel Operating Co.*, 2009 WL 2487984, at *2 (M.D. La. Aug. 11, 2009) ("[A] privilege log . . . should not only identify the date, the author, and all recipients of each document listed therein, but should also describe the document's subject matter, the purpose for its production, and a specific explanation of why the document is privileged or immune from discovery.").

[14] The Insurer Defendants also claim that the "attorney-client privilege and work product privilege extends to communications between the Insurer Defendants, the insureds and their counsel, by virtue of the common interest [or joint defense] privilege." (R. Doc. 231 at 8). However, because the common interest privilege merely extends the attorney-client and work product privileges to communications and documents shared among co-defendants or

**Attorney-client privilege.**[15] Based on the Court's review of the 758-page privilege log, it seems Defendants are claiming the attorney-client privilege protects any communication or document simply because an attorney is involved. (R. Doc. 213-3 at 370) ("9/2/2016 Email (call from Ted Blackmon" sent by Matt Willson to Anthony Ver Meer, "James Holland (attorney for Bracken), Bill Whitfield (attorney for C3)"); (R. Doc. 213-3 at 391) ("5/24/2017 Email (contacting Maegan Worley" sent by Matt Willson to "Bruce C. Gaible (attorney for Bracken), Andrew Sarne (attorney for Jaramillo), Andrew T. McKinney (attorney for C3) cc: Kimberly S. Ridling (Travelers), Anthony J. Ver Meer (Travelers)."); (R. Doc. 213-3 at 404) ("7/8/2016 Claim note (communications with defense counsel Bill Whitfield and Johnny Nelms re vehicle inspection, email from C3 counsel Jessie Mitchell)" by Anthony Ver Meer, claiming "attorney-client privilege (email to defense attorneys Johnny Nelms and Bill Whitfield reproduced in claim note)").

But "the attorney-client privilege does not apply simply because documents were sent to an attorney. Indeed, more is required. To begin, it is vital . . . that the communication have been made and maintained in confidence. [And] [a] confidential communication between client and

---

potential co-defendants, it only applies if the underlying privileges are first established, which the Insurer Defendants have failed to do. *Shaw Group, Inc. v. Zurich Am. Ins. Co.*, 2014 WL 1784051, at *14 n.20 (M.D. La. May 5, 2014) ("The joint defense privilege" or "'common interest' doctrine, is not an independent privilege, but is instead an extension of the attorney-client privilege" or work product doctrine and protects communications or documents exchanged between those with a common interest.); *Miller v. Gorski Wladyslaw Estate*, 2007 WL 9734153, at *2 (W.D. La. Feb. 19, 2007) ("The common interest rule applies equally as an extension of both the attorney-client privilege and the work product doctrine."). Beyond that, even if the underlying privileges applied, the Insurer Defendants have not provided the Court with any information supporting the joint defense or common interest privilege, other than arguing that it generally applies between insurers and insureds. There is no evidence or even suggestion that the documents and communications "were exchanged among attorneys with identical litigation perspectives to coordinate legal strategies, or to advance a joint defense effort or strategy that has been decided upon and undertaken by the parties and their respective counsel." *LeBlanc v. Texas Brine Co., LLC*, 2019 WL 5265063, at *6 (E.D. La. Oct. 17, 2019) (rejecting assertion of common interest privilege under Louisiana Code of Evidence article 506(B)(3) where underlying privileges had not been established and there was no evidence supporting a common interest).

[15] Consistent with its prior Order, the Court will again "apply Louisiana law to govern the scope and applicability of the attorney-client privilege," although "parts of the Court's Order cite to federal cases, in addition to case law from Florida, as merely instructive." (R. Doc 278 at 12 n.3) (analyzing the appropriate state's law concerning the scope and application of the attorney-client privilege).

counsel is privileged only if it is generated for the purpose of obtaining or providing legal assistance." *Equal Employment Opportunity Comm'n v. BDO USA, L.L.P.*, 876 F.3d 690, 696 (5th Cir. 2017); *see also* La. C. Evid. art. 506(B) ("A client has a privilege to refuse to disclose . . . a confidential communication . . . made for the purpose of facilitating the rendition of professional legal services to the client . . . ."); *Swoboda v. Manders*, 2016 WL 2930962, at *5 n.41 (M.D. La. May 19, 2016) ("[N]ot all communications between an attorney and client . . . constitute legal work entitled to attorney-client privilege. For example, no privilege attaches when an attorney performs investigative work in the capacity of an insurance claims adjuster, rather than as a lawyer.").

Critical here, for each entry claiming the attorney-client privilege, the Insurer Defendants' privilege log does not indicate the capacity in which the attorney was serving (e.g., in-house counsel, litigation counsel, outside counsel),[16] nor does it indicate whether "the communications were rendered for the purpose of providing *legal advice*." *Swoboda v. Manders*, 2016 WL 2930962, at *5 (M.D. La. May 19, 2016) ("the Court does not find anywhere in the Declaration an assertion that Continental was serving as H&K's *counsel with regard to potential litigation related to the G36* . . . ."); *In re Vioxx Prod. Liab. Litig.*, 501 F. Supp. 2d 789, 808 (E.D. La. 2007) ("Relative to attorney-client privilege claims," for "the individuals authoring or receiving the documents . . . their relationships to the content of the documents were not explained . . . ."); *In re*

---

[16] And it is often not clear whether a communication was actually directed to an attorney, as many were transmitted to multiple individuals—both attorneys and non-attorneys. *In re Vioxx*, 501 F.Supp.2d at 798–99 (E.D. La. 2007) ("The lawyer's role as a lawyer must be primary to her participation in a communication for privilege to attach. . . . In this regard, it should be noted that the number of lawyers or non-lawyers to whom a communication was disseminated is not dispositive. A communication could be to several lawyers and one non-lawyer and lose its primary legal purpose gloss if the non-lawyer were sent the communication for non-legal purposes.); *United States ex rel. Barko v. Halliburton Co.*, 74 F. Supp. 3d 183, 188–89 (D.D.C. 2014) ("Parties, including corporations, may not shield otherwise discoverable documents from disclosure by including an attorney on a distribution list. Thus, the fact that an attorney either is copied on or is one of multiple recipients of an email does not on its own support a claim of attorney-client privilege.").

*Domestic Airline Travel Antitrust Litig.*, 2020 WL 3496748, at *7 (D.D.C. Feb. 25, 2020) (attorney-client privilege not supported where proponent failed to explain "the legal role counsel played with respect to any particular document.").[17] For example, a July 14, 2016 claim note by Anthony Ver Meer being withheld under the attorney client privilege is simply described as:

> "[Description:] Claim note (reserves, communication with agent, communication with defense attorneys and insured) . . . [Basis for Withholding:] attorney client privilege (email to Ben Wadlington, Chris Bracken, and defense counsel Jesse Mitchell, Bill Whitfield, and Johnny Nelms reproduced in claim note)."

(R. Doc. 213-3 at 410). There is no information regarding the topics discussed with the 'defense attorneys' or any indication that Ver Meer was seeking legal advice as a representative of one of the attorneys' clients. And this is consistent with entries throughout the privilege log. (R. Doc. 213-3 at 410) ("attorney-client privilege (contains summary of call with defense counsel and insureds)"); (R. Doc. 213-3 at 419) ("Claim note (VM for defense counsel Johnny Nelms)"); (R. Doc. 213-3 at 496) ("Email (meeting and contact info)" withheld under attorney-client privilege because it was sent by Matt Willson to "Chris Bracken (Bracken), James Holland (attorney for Bracken)").

These descriptions are clearly insufficient to withhold information based on the attorney-client privilege. *Compare Firefighters' Ret. Sys. v. Citco Grp. Ltd.*, 2018 WL 305604, at *6 (M.D. La. Jan. 5, 2018) (finding privilege log entries sufficient where role of counsel was explained and each entry described the "subject matter of the purported legal advice" being sought; for example,

---

[17] The Court is aware that certain lawyers representing some of the Defendants in this litigation are included in some of the entries throughout the privilege log. However, the privilege log fails to indicate the capacity in which the lawyer was acting at the time of the communication, fails to indicate that the communication is being directed to the lawyer in an effort to obtain legal advice, and often does not indicate the particular claimant to which the communication pertains. Finally, the claim file materials falling within the scope of discovery are those documents related to the Blackmons that were generated between June 15, 2016, and October 19, 2017—months before this litigation was filed. For all these reasons, the presence of any litigation counsel does not alter the Court's analysis. *Equal Employment Opportunity Comm'n v. BDO USA, L.L.P.*, 876 F.3d 690, 696 (5th Cir. 2017) ("There is no presumption that a company's communications with counsel are privileged.").

"'email chain with counsel requesting legal advice re: interpretation of Leveraged Offering Memorandum in connection with Global Hawk settlement with RBS'"), *with Bowne of New York City, Inc. v. AmBase Corp.*, 150 F.R.D. 465, 474–75 (S.D.N.Y. 1993) (rejecting party's assertion of attorney-client privilege "because its privilege log, unsupported by any evidence, is inadequate to sustain its claims"; for example, log described one document as a "'handwritten memo with memo from Scott Freeman to Bruce Bean' and its subject was 'Proxy Statement.' . . . Nothing on the log informs us whether the document contains legal advice or was prepared to elicit legal advice from others.").

Moreover, other entries merely provide status updates, which are generally not protected by the attorney-client privilege. (R. Doc. 213-3 at 57) ("2/1/2017 Email (update on status of claims)" from Ver Meer to non-attorneys and attorneys); (R. Doc. 213-3 at 190) ("7/31/2017 Email (requesting update on status)" from attorney to Ver Meer, other non-attorneys and attorneys); (R. Doc. 213-3 at 381) ("2/15/2017 Email (thanking for update on status of claims)" from an attorney for C3 to Ver Meer, other non-attorneys and attorneys). *See In re Imperial Corp. of Am.*, 167 F.R.D. 447, 452 (S.D. Cal. 1995) ("The letters were written for the purpose of apprising American Casualty of the status of the case, not for seeking or imparting legal advice."); *Meade v. Gen. Motors, LLC*, 250 F. Supp. 3d 1387, 1392 (N.D. Ga. 2017) ("For example, reports reflecting the status of litigation and containing purely factual information are not privileged."); *Universal City Dev. Partners, Ltd. v. Ride & Show Eng'g, Inc*., 230 F.R.D. 688, 690–91 (M.D. Fla. 2005) ("It is generally recognized that the communication of factual information is not protected by the attorney-client privilege. For example, reports reflecting the status of litigation . . . .").

And so, the Court finds the Insurer Defendants have not met their burden of establishing that all the withheld documents falling within the scope of discovery are protected by the attorney-client privilege.

**Work product doctrine.** The Court finds Defendants' assertion of work product over the Blackmons' claim file materials equally unsubstantiated. Work product consists of "documents and tangible things . . . prepared in anticipation of litigation or for trial by or for another party or its representative . . . ." Fed. R. Civ. P. 26(b)(3)(A).[18] Aside from the severity of the accident, *see Hamilton v. Canal Barge Co.*, 395 F. Supp. 975, 976 (E.D. La. 1974) (given fatal injuries were involved, work product applied to "five eyewitness statements, taken the day of the accident by the defendant's insurance adjuster," although court ultimately required production), Defendants have not pointed to any evidence that shows they reasonably anticipated litigation of the Blackmons' claims from day one, or that certain documents were not prepared in the ordinary course of business.

First, the Insurer Defendants represent that Mr. Blackmon indicated, from the start, that he would be handling the claims himself—i.e., without a lawyer, as he did not trust lawyers—and wanted to settle quickly. (Willson Decl., R. Doc. 145-2 at 2-3) (On September 2, 2016, Blackmon told Willson "he would like to proceed as soon as possible"); (Answer to Interrog. No. 9, R. Doc. 213-2 at 31) (On November 21, 2016, "Ted Blackmon advised that he would prefer to have the matter resolved."); (R. Doc. 204 at 19) (Mr. Blackmon "needed money quickly and wanted to avoid the delay of litigation"). And although Mr. Blackmon briefly retained personal injury attorneys for just over a month, Defendants claim that immediately after Mr. Blackmon fired those attorneys, he assured Ver Meer that he still "did not want to go through . . . litigation and would

---

[18] Whether documents are protected by the work product doctrine is governed by federal law, even in diversity cases. *See Conoco Inc. v. Boh Bros. Const. Co.*, 191 F.R.D. 107, 118 (W.D. La. 1998).

prefer to put this matter behind him," on March 29, 2017. (Answer to Interrog. No. 9, R. Doc. 213-3 at 36). Therefore, the record indicates the Insurer Defendants reasonably anticipated *avoiding* litigation of the Blackmons' claims—not the opposite.

Under these circumstances, the almost-immediate retention of counsel by both Russell Koop and Shemika Robinson's estate does not then justify a reasonable anticipation of litigation with respect to Mr. Blackmon, as Defendants suggest. (R. Doc. 231 at 10, 12) ("The fact that the adjuster received a letter of recommendation from an accident claimant's attorney only two weeks after the accident demonstrates that the adjuster's anticipation of litigation was reasonable."); (R. Doc. 213-3 at 348) (indicating LOR for Ms. Robinson on Aug. 22, 2016); (R. Doc. 213-3 at 326) (LOR for Koop on June 29, 2016). Moreover, Defendants have insisted that any materials associated with the Koop and Robinson claims are wholly irrelevant, while at the same time relying on Koop and Robinson's retentions of counsel to withhold documents from the Blackmons in discovery. Defendants cannot have it both ways. Simply put, if Koop and Robinson's claims are irrelevant, so are their retentions of counsel.

Second, Ver Meer and Matt Willson's own Declarations establish that they each conducted investigations and settled claims as part of their routine job duties (Ver Meer Decl., R. Doc. 30-2 at 1); (Willson Decl., R. Doc. 145-2 at 1). *See Williams v. United States Envtl. Servs., LLC*, 2016 WL 617447, at *4 (M.D. La. Feb. 16, 2016) ("[T]he redacted documents do not constitute work product as they are part of a human resources investigation and were created in the ordinary course of business. In its Interrogatory Responses, Defendant explained that Ms. Fobb 'is primarily responsible for conducting all investigations regarding complaints of employment discrimination, harassment, or retaliation.' Ms. Fobb's internal investigation and the documents created in connection with it were a result of Defendant's routine business practice . . . and would have

occurred regardless of any threat of litigation."); *Glover v. Glover v. Kansas City S. Ry. Co.*, 2013 WL 3974533, at *4 (E.D. La. Aug. 2, 2013) ("As the case law cited above establishes, the mere fact that a document is prepared when litigation is foreseen does not mean it was prepared in anticipation of litigation. Vanicor's deposition testimony submitted by plaintiff establishes that the taking of witness statements was done by Vanicor in the ordinary course of his job function as to every railroad accident in his territory, regardless whether litigation was anticipated or ever occurred."). This indicates that the claim file documents related to the Blackmons were prepared in the ordinary course of business.

Moreover, the privilege log entries are inadequate to establish that each document withheld as work product contains mental impressions or legal strategies related to this litigation or that it was created in anticipation of this litigation. "[C]ourts presented with work product disputes in the insurance context must be careful not to hold that documents are protected from discovery simply because of a party's 'ritualistic incantation' that all documents created by insurers are made in preparation for litigation . . . ." *Weber v. Paduano*, 2003 WL 161340, at *4 (S.D.N.Y. Jan. 22, 2003).

Here, consistent with their argument that the anticipation of litigation should be presumed after a fatal accident, the Insurer Defendants' privilege log indicates a clear assumption that every claim file document associated with its investigation and handling of the accident is automatically protected as work product. (R. Doc. 213-3 at 188) ("6/18/2016 Claim Acknowledgment" from Travelers to C3 Construction withheld as work product without further explanation); (R. Doc. 213-3 at 181) ("7/12/2016 NADA Value of 1997 Lexus LS Sedan 4D LS400" by Ver Meer withheld as "work product," without further explanation); (R. Doc. 213-3 at 190) ("8/22/2017 Email (request for call)" from Ver Meer to Whitfield "(attorney for C3)"); (R. Doc. 213-3 at 203)

("8/4/2016 Email (inquiries regarding Jaramillo, C3, and Bracken)" from Ver Meer to non-attorneys and attorneys); (R. Doc. 213-3 at 204) ("7/12/2016 Email (Complex Claim Unit Consultation form)" from Ver Meer to employees of Travelers).

The Insurer Defendants' cannot rely on these assumptions to meet their burden, especially considering the record evidence noted above, which supports the opposite conclusion. *See Lanelogic, Inc. v. Great American Spirit Ins. Co.*, 2010 WL 1839294, at *6 (N.D. Tex. May 6, 2010) (insurance company's statement that "the primary motivating purpose for the creation of such documents was to aid in possible future litigation" were "self-serving" and could not carry the day where "other evidence suggests that litigation concerns were not the primary motivating purpose behind the creation of the documents at issue"); *Pete Rinaldi's Fast Foods, Inc. v. Great Am. Ins. Companies*, 123 F.R.D. 198, 202 (M.D.N.C. 1988) ("An insurance company cannot reasonably argue that the entirety of its claims files are accumulated in anticipation of litigation when it has a duty to investigate, evaluate and make a decision with respect to claims made on it by its insured."). And so, the Court finds the Insurer Defendants' assertions of work product, in addition to attorney-client privilege, to be unsupported.

As a final note, the Court will not allow the Insurer Defendants additional opportunities or avenues to meet their burden of establishing either privilege. *Firefighters' Ret. Sys. v. Citco Grp. Ltd.*, 2018 WL 305604, at *7 (M.D. La. Jan. 5, 2018) (allowing supplemental log where court was unable to assess privilege). First, the only support offered by the Insurer Defendants to substantiate their assertions of both attorney-client privilege and work product is their 758-page privilege log produced in response to the discovery requests at issue. The Court has just explained how the log is inadequate to substantiate the privileges being claimed. But even more important, after those assertions of privilege were challenged by Plaintiffs, the Insurer Defendants did nothing more to

substantiate them. They did not produce any supporting evidence or affidavits from the attorneys or other individuals listed on the log. Moreover, they failed to even provide the Court with additional detail in their briefing that might assist it in assessing the applicability of either the attorney-client or work product privileges. *See Bowne of New York City, Inc. v. AmBase Corp.*, 150 F.R.D. 465, 475 (S.D.N.Y. 1993) ("There simply is not enough information supplied to support the privilege claims of AmBase with regard to its documents, particularly in the absence of any supporting evidence.").

Instead, the Insurer Defendants filed an untimely Motion for Protective Order asking the Court to conduct a blanket in-camera review before ordering production of any withheld documents, which the Court has denied. And what's more, even that later Motion for Protective Order did not provide any supporting evidence or additional information substantiating their privilege claims. *See Victor Stanley, Inc. v. Creative Pipe, Inc.*, 250 F.R.D. 251, 254 n.2 (D. Md. 2008) (although a party initially produced  privilege log, "once the claims of privilege/protection have been challenged by the requesting party, the producing party must then establish an evidentiary basis to support the privilege/protection claim. Failure to do so results in a forfeiture of the privilege/protection claimed."). In other words, the Insurer Defendants gave themselves a second chance to meet their burden, yet failed to take it.

And while federal district courts often undertake an in-camera review in determining the privileged nature of documents, that approach is not warranted here for several reasons. First, it is the Insurer Defendants' burden to prove the applicability of any claimed privilege and their effort in doing so has been minimal. While they did produce a 758-page privilege log, quantity does not equal quality. Moreover, the Insurer Defendants then failed to provide any additional support once their claims of privilege were challenged. Second, the sheer number of documents being

withheld—potentially over 10,000—makes an in-camera review particularly inappropriate, considering the amount of judicial resources that will be expended in large part because the Insurer Defendants failed to carry their own burden. *See Bowne of New York City, Inc. v. AmBase Corp*., 150 F.R.D. 465, 475 (S.D.N.Y. 1993) ("AmBase's suggestion of in camera review in lieu of an evidentiary presentation is misplaced. Such review may be useful if there is a genuine dispute between the parties as to the accuracy of the withholding party's description of certain documents. Such review is not, however, to be routinely undertaken, particularly in a case involving a substantial volume of documents, as a substitute for a party's submission of an adequate record in support of its privilege claims.").

The Court must also point out that Defendants' privilege log lists an August 22, 2017 email described only as a "request for call" sent by Anthony Ver Meer to "Bill Whitfield (attorney for C3)." (R. Doc. 213-3 at 190). The Court has no clue as to Mr. Whitfield's role—in-house counsel, outside counsel on retainer, counsel of record in an on-going litigation, etc. No other information is provided on the privilege log, except that the email is being withheld on the bases of attorney client privilege and work product. Incredibly, this email was nonetheless filed in the record—unredacted—by Defendants. (R. Doc. 88-14 at 1). It is not privileged. Instead, Ver Meer is simply forwarding to Whitfield the following request from Nick Medley, Plaintiffs' estate attorney—"refresh my memory: what do you need from me in order to pay the claim to the estate?" (R. Doc. 88-14).

To be sure, the Court found Defendants' assertions of privilege unsubstantiated, even before this email. But it now also questions whether the privileges are being asserted in good faith. *See Victor Stanley, Inc. v. Creative Pipe, Inc.*, 250 F.R.D. 251, 265 (D. Md. 2008) ("[T]here is an almost irresistible tendency to be over-inclusive in asserting privilege/protection. . . . Counsel

should be wary of . . . assert[ing] privilege/protection as a basis for refusing . . . production without having a factual basis to support each element of each privilege/protection claimed for each document withheld, because doing so is a sanctionable violation of [Rule] 26(g).”). For this additional reason, the Court will not conduct an in-camera review or otherwise provide Defendants another opportunity to substantiate their privilege claims.

Indeed, any further opportunity to establish either privilege would be futile. As discussed below, even if the Court found that the withheld documents are protected by either the attorney-client or work product privileges, both have been waived. In other words, the documents would still be subject to production, despite any privilege that once applied.

### iii.    Claim File Materials – Waiver of Privilege

Even if the Court assumed that both the attorney-client privilege and work product applied, by submitting their Answer to Interrogatory No. 9 and the Declarations of Ver Meer and Willson in support of their defense, Defendants have waived any privilege for those underlying materials.[19] *See Schwegmann Westside Expressway, Inc. v. Kmart Corp.*, 1995 WL 510071, at *6 (E.D. La. Aug. 25, 1995) (“Schwegmann has waived its privileges with respect to matters covered in Mr. Whittaker's affidavit,” submitted in opposition to summary judgment.); *Friction Div. Prod., Inc. v. E.I. Du Pont De Nemours & Co.*, 117 F.R.D. 535, 538 (D. Del. 1987) (finding waiver of work product; “plaintiff's assertion in the Supplemental Answer to Interrogatory No. 1 that the invention date and written descriptions of the semi-metallic claims arose during the period March–August, 1980, created the opening for DuPont to investigate the foundations for those representations.”); *Computer Network Corp. v. Spohler*, 95 F.R.D. 500, 502 (D.D.C. 1982) (“He cannot foreclose discovery of the factual basis for his factual representations in the affidavit . . . . [E]ven if the

---

[19] To be clear, the ‘underlying materials’ are those claim file materials previously described by the Court as falling within the scope of permissible discovery.

[factual representations] came within the attorney-client privilege . . . the privilege was waived. A party cannot voluntarily disclose facts in his favor before a judicial tribunal, when they are helpful to his cause, and then invoke the attorney-client privilege as a shield."); *In re Powerhouse Licensing, LLC*, 441 F.3d 467, 473-74, 2006 (6th Cir. 2006) ("The decision to include Shefferly's affidavit represents a litigation strategy fraught with obvious risks; surely, counsel must have realized that it would be "pushing the envelope" with respect to the attorney-client privilege to introduce an affidavit from an attorney intimately involved in structuring the very transactions alleged to have been fraudulent. . . . [C]ounsel for petitioners elected to interject Shefferly into these proceedings and thereby waived the attorney-client privilege. In so doing, the work product privilege was waived as well."); *Government Guar. Fund of Republic of Finland v. Hyatt Corp.*, 177 F.R.D. 336, 341–42 (D.V.I. 1997) ("By using the Declaration of Michael C. Shindler to support its opposition to the Skopbank Parties' motion for partial summary judgment, Hyatt waived the privilege as to Mr. Shindler's communication relating to the subject matter of the declaration. Hyatt cannot use an officer and active player in it's relationship with Skopbank Parties to put forth facts supporting its opposition and then deny access" to the underlying information.); *Willis Elec. Co. v. Polygroup Macao Ltd.*, 2020 WL 1934425, at *2 (D. Minn. Apr. 22, 2020) (waiver of attorney client privilege for statements made in Mr. Fonder's Declaration; "Mr. Fonder did more than simply reveal the date of his communications; he also represented that the substance of those communications supported his conclusion that the invention date as at least as early as May 18, 2010."); *Cincinnati Ins. Co. v. Zurich Ins. Co.*, 198 F.R.D. 81, 87 (W.D.N.C. 2000) (insurer impliedly waived privilege as to both fact and opinion work product by offering its attorney's opinion as to settlement value of underlying case).

And so, the Court finds any privilege that might have applied to the claim file materials that are related to the Blackmons and fall within the scope of discovery, as described above, has been waived. Defendants have placed these materials at issue by relying on them to defend against Plaintiffs' allegations and to show the reasonableness of their adjustment and settlement of the Blackmons' claims. *See Williams v. United States Envtl. Servs*., LLC, 2016 WL 617447, at *5 (M.D. La. Feb. 16, 2016) (finding that defendant waived work product protection by citing to sexual harassment investigation in its briefing on a motion to compel "to show that it exercised reasonable care to promptly correct any harassing behavior" after receiving reports of harassment, and thereby defend against plaintiff's sexual harassment and retaliation claims).

Therefore, Plaintiffs' Motion to Compel is **GRANTED** as to **Request for Production No. 24** and Defendants must produce "all documents supporting the specific factual statements made" in both Anthony Ver Meer and Matt Willson's Declarations **within 21 days** of this Order.

Plaintiffs' Motion to Compel is likewise **partially GRANTED** as to **Requests for Production Nos. 8, 9, and 15** to the extent Defendants must produce the claim file materials that fall within the scope of discovery, as outlined above, **within 21 days** of this Order.

If any of the **responsive documents** contain **information** about the **other accident victims**, those portions of the documents must be **redacted**.

### E.    Potential Exposure for the Collision

Plaintiffs also seeks production of materials "reflecting [the Insurer Defendants'] understanding of [their] potential exposure for the collision"—i.e., "coverage opinions, large loss reports, exposure, risk of excess and reserves." (R. Doc. 213-1 at 39) (Request for Production Nos. 6, 7, 19, 28, 30, 33). Plaintiffs request this information for all 4 accident victims, consistent with their other discovery requests. And Defendants have again withheld all responsive materials that

would be included in the claim files[20] as protected by either the work product doctrine or the attorney client privilege.

The Court has already found that any valuation of the Blackmons' claims created between June 15, 2016, and October 19, 2017, is discoverable. Again, if those documents were privileged, that privilege was waived when the Insurer Defendants placed the reasonableness of their settlement offer at issue in their Answer to Interrogatory No. 9 and Ver Meer's Declaration. Moreover, the Court still questions whether the 'exposure' documents would have been privileged to begin with. As previously stated, both Ver Meer and Willson indicated that their regular job duties included "gathering information and supporting documentation in order to make coverage and liability determinations, communicating with policyholders and claimants, and negotiating settlements" (Ver Meer Decl., R. Doc. 30-2 at 2). *See Shields v. Boys Town Louisiana, Inc*., 2016 WL 1298986, at *2 (E.D. La. Apr. 4, 2016) (If the document would have been created regardless of whether the litigation was also expected to ensue, the document was created in the ordinary course of business and not in anticipation of litigation.); *Hill Tower, Inc. v. Dep't of Navy*, 718 F. Supp. 562, 566 (N.D. Tex. 1988) ("The mere fact this report deals with facts, opinions, and recommendations that later may be the focus of litigation does not establish that there was the expectation of litigation when this document was drafted."). Beyond that, the record again does not support that litigation of the Blackmons' claims was reasonably anticipated. And so, any documents "reflecting [the Insurer Defendants'] understanding of [their] potential exposure" for the Blackmons' claims between June 15, 2016, and October 19, 2017, must be produced.

As for the remaining accident victims, the Court has already found that claim file materials that would include the information at issue here, related to either Russell Koop or Shemika

---

[20] The Court did not include this information in its prior discussion of the claim file materials, because it was presented as a separate issue in Plaintiffs' Motion to Compel (R. Doc. 213).

Robinson, are generally not within the scope of discovery. In general, that remains the case for any documents related to the Insurer Defendants' understanding of their "potential exposure for the collision." (R. Doc. 213-1 at 39). With the possible exception noted below, the Court finds any documents related to the valuation of Russell Koop or Shemika Robinson's claims to be irrelevant based on the allegations made in the Complaint. The Court finds it critical that, throughout Plaintiffs' extensive allegations, they do not claim that Defendants committed the alleged fraud out of fear that all 4 of the claims together might exceed the $12 million in potential coverage— or even the $2 million in liability coverage. Instead, Plaintiffs repeatedly claim that Defendants saw an opportunity to save some money on the Blackmons' claims, and they seized it. (R. Doc. 79) (claiming Defendants withholding crucial policy information, thereby inducing them to negotiate without counsel and to settle for far less than their claims were worth). Therefore, the valuations of Russell Koop and Shemika Robinson's claims are generally not relevant or within the scope of permissible discovery.

**Possible Exception.** Both Shemika Robinson and her young son, Khance Blackmon, unfortunately passed away as a result of this accident, which occurred near Mobile, Alabama, on June 15, 2016. According to the record, Khance died instantly while Ms. Robinson was airlifted to a hospital where she passed away hours later. Ms. Robinson's estate filed suit sometime in August of 2016—roughly 2 months after the accident. At the outset, the Court finds that any valuation of Ms. Robinson's claim after her estate filed suit in Texas was surely prepared in connection with that litigation, is protected as work product, and Plaintiffs have not shown a substantial need for that information for the reasons given in the preceding paragraph. Beyond that, the cost of litigation would then also be a factor considered in any valuation after suit was filed, making any post-filing assessment of Ms. Robinson's claim even less comparable to that of

her son's. As such, any valuations of Ms. Robinson's wrongful death claim made after the filing

her estate's lawsuit are not discoverable.

But as explained below, valuations of Ms. Robinson's claim made prior to suit being filed

in Texas may be relevant and discoverable if the following conditions are met: (1) there are

contemporaneous valuations of Khance Blackmon's claims (i.e., made between June 15, 2016, and

the date Ms. Robinson's estate filed suit); and (2) the contemporaneous valuations for both

Shemika Robinson and Khance Blackmon apply Alabama law. If any other state's law is applied

to either claimant, then none of the valuations for Shemika Robinson are discoverable for the

reasons that follow, even those created before her suit was filed.

As it stands today, "in every jurisdiction except Alabama, wrongful death damages

compensate survivors for their losses." Susan Randall, *Only in Alabama: A Modest Tort Agenda*,

60 ALA. L. REV. 977, 982 (2009); *see also* Ala. Code § 6-5-410 (wrongful act causing death); *In

re Tylenol (Acetaminophen) Mktg., Sales Practices & Prod. Liab. Litig.*, 144 F. Supp. 3d 680, 684

(E.D. Pa. 2015) ("The Alabama wrongful death statute is like no other in the United States.").

Indeed, Alabama only permits the recovery of punitive damages, and jurors are told to consider

only the tortfeasor's wrongdoing; they are specifically instructed not to consider the pecuniary

value of the decedent's life or the need to compensate the decedent's family. *See* Ala. Pattern Jury

Instrs., Civ. 11.18; *see also Alabama Power Co. v. Turner*, 575 So.2d 551, 556 (Ala. 1991) ("In

Alabama, only punitive damages are available in wrongful death actions, and these damages may

be awarded against a defendant based on its negligent conduct."); *Campbell v. Williams*, 638 So.

2d 804, 809 (Ala. 1994) ("[T]he purpose being the preservation of human life regardless of the

pecuniary value of a particular life to next of kin under statutes of distributions, the admeasurement

of the recovery must be by reference alone, to the quality of the wrongful act or omission . . . .").

Beyond that, Alabama is the only state in which a tort claim does not survive the death of the victim. *Bassie v. OBGYN Assocs. of Nw. Alabama, P.C.*, 828 So. 2d 280, 282 (Ala. 2002) ("In Alabama, a deceased's unfiled tort claims do not survive the death of the putative plaintiff."); Ala. Code § 6-5-420 (survival claims). In other words, under Alabama law, neither Ms. Robinson nor Khance Blackmon have a survival claim—only claims for wrongful death. And jurors assessing the value of their wrongful death claims would consider the exact same thing—the conduct of Jhon Jaramillo and nothing else. *See Atkins v. Lee*, 603 So.2d 937, 943 (Ala. 1992) (The focus of a wrongful death claim under Alabama law is on the defendants' conduct.).

However, if Florida or Louisiana law applies, the value of their claims diverge greatly. To begin, damages for wrongful death would compensate the survivors, focusing on their relationship with the victim and accounting for the loss of consortium, support and services, as well as pain and suffering. *See* La. Civ. Code Ann. art. 2315.2 (In Louisiana, survivors may "recover damages which they sustained as a result of the death."); Fla. Stat. Ann. § 768.20 ("the decedent's personal representative, who shall recover for the benefit of the decedent's survivors and estate all damages, as specified in this act, caused by the injury resulting in death."). Moreover, Shemika Robinson's estate could additionally bring a survival action for Ms. Robinson's damages incurred in the hours between the accident and her death.

The relevancy—and discoverability—of the sought-after information therefore changes drastically if Alabama law is applied. Yet incredibly, despite filing hundreds of pages of briefing and 6 Motions to Compel seeking this or similar information, Plaintiffs made no effort to brief this issue or even advise the Court as to the unique nature of wrongful death and survival actions in Alabama.[21] Nonetheless, the Court finds that any valuations meeting the conditions outlined above

---

[21] Instead, Plaintiffs mention in a single sentence of a Reply brief—filed in connection with a separate discovery Motion—that Alabama law applies to Khance Blackmon's wrongful death claim. (R. Doc. 279 at 4 n.5). Which states'

are relevant and fall within the scope of discovery. To the extent any responsive valuations would be protected as work product (or by the attorney-client privilege), the Court finds Plaintiffs have shown a waiver based on the reasonableness of Khance Blackmon's settlement being placed at issue. There is likewise a compelling need for the information and an inability to otherwise obtain this information.

Therefore, Plaintiffs' earlier Motion to Compel (R. Doc. 213) is **partially GRANTED only to the extent** that Plaintiffs may obtain Defendants' **valuations** of Shemika **Robinson's** claim (1) that were **created** between **June 15, 2016**, and the date her estate **filed suit** in Texas, (2) if the following **conditions** are also met: (a) there are **contemporaneous valuations** of Khance Blackmon's claims (i.e., made between June 15, 2016, and the date Ms. Robinson's estate filed suit); and (b) the contemporaneous valuations for both Shemika Robinson and Khance Blackmon **apply Alabama** law.[22] If any responsive documents exist, the Insurer Defendants are **ORDERED** to **supplement** their responses **within 21 days** of this Order.

If any other state's law is applied to either claimant, then none of the valuations for Shemika Robinson are discoverable. If none of the valuations meet the conditions outlined above, Defendants are still **ORDERED** to **supplement** their discovery **responses** to **verify** that no responsive documents exist **within 21 days** of this Order.

### F.    Settlement of Shemika Robinson's Texas Lawsuit

Shemika Robinson's estate, represented by her mother, Alfredia Robinson, filed suit in Texas state court against the Insured Defendants (C3, Bracken, and Jaramillo) sometime in August

---

law will apply in this lawsuit has not been decided. But what's relevant here is the law applied by the Insurer Defendants in their earliest valuations of Ms. Robinson's and Khance Blackmon's claims.

[22] If any of the responsive documents also include information related to Russell Koop, that information must be redacted.

of 2016—roughly 2 months after the June 15, 2016 accident. (R. Doc. 213-3 at 204) (E7Q2165, Bates No. 551-53: Citation and Affidavit of Service in Robinson (Aug. 30, 2016)). According to Plaintiffs, the Insured Defendants reached a confidential settlement in Shemika Robinson's lawsuit in May of 2019 (R. Doc. 252-2), and the Texas court entered a Final Judgment dismissing the suit on October 29, 2019. (R. Doc. 237-11).

In their most recent Motions to Compel (R. Docs. 252-256), Plaintiffs ask the Court to compel production of the following documents related to the settlement of Shemika Robinson's lawsuit from the various Defendants:

**Request for Production No. 47:**
Produce a copy of the settlement agreement executed by the parties in the matter captioned *Alfredia Robinson, Individually and as Representative of Shemika Robinson, Deceased v. C3 Construction Services, Inc., et al*., in the 164th District Court, Harris County, Texas, along with any and all documents referenced in or attached to that agreement.

**Request for Production No. 48**
Produce any and all correspondence related to settlement; . . . copies of any and all documents relating to final or proposed settlements; copies of any proposed or final receipt and release documents; and copies of any and all documents relating to any preliminary or proposed offers of compromise and/or settlement . . . which were exchanged between and/or shared with anyone other than your attorneys related to the matter . . . of *Shemika Robinson, Deceased v. C3 Construction Services, Inc., et al*. . . . .

**Request for Production No. 49:**
Produce any and all documents considered or reviewed by you in evaluating your potential exposure for, settlement value of, and/or litigation value of claims asserted in the matter . . . of *Shemika Robinson, Deceased v. C3 Construction Services, Inc., et al*. . . . .

**Request for Production No. 50:**
Produce any and all of the 'settlements and verdicts in litigated claims' that you 'looked at,' as referenced in Paragraph 28 of the Declaration of Anthony Ver Meer . . . . and also produce any and all other documents that you reviewed or considered in your evaluation of the settlement and/or litigation value of the claims of the Estate of Khance Blackmon, regardless of whether those documents support or

refute your position that 'according to our evaluation, $550,000 was a fair offer' for the settlement of such claims.

(R. Doc. 253 at 2-4) (Request for Produc. Nos. 47-50 to Insurer Defs.); (R. Doc. 252-1 at 6-8) (Request for Produc. Nos. 48-50 to Ver Meer); (R. Doc. 254 at 1-3) (Request for Produc. Nos. 31-33 to C3 Construction); (R. Doc. 255 at 2-3) (Request for Produc. Nos. 31-33 to Jaramillo); (R. Doc. 256 at 1-3) (Request for Produc. Nos. 31-33 to Bracken).

To begin, Request for Production No. 50, which asks the Insurer Defendants, as well as Ver Meer, to produce "settlements and verdicts" referenced in paragraph 28 of Ver Meer's Affidavit is wholly redundant of Plaintiffs' Request for Production No. 24 (R. Doc. 213-1 at 34), which the Court has already considered in connection with Plaintiffs' earlier Motion to Compel (R. Doc. 213). Plaintiffs have demonstrated a habit of redundant and excessive discovery requests and the Court cautions all parties to this action that Rule 26(g) sanctions may be imposed going forward if the parties continue to propound knee-jerk discovery requests or responses.[23] *Mancia v. Mayflower Textile Servs. Co.*, 253 F.R.D. 354, 358 (D. Md. 2008) (Rule 26(g) "aspires to eliminate one of the most prevalent of all discovery abuses: kneejerk discovery requests served without consideration of cost or burden to the responding party.").

Because the information at issue in Request for Production No. 50 was already resolved in Plaintiffs' favor, their Motions to Compel the Insurer Defendants (R. Doc. 253) and Ver Meer (R.

---

[23] Rule 26(g) makes clear that the Court must impose appropriate sanctions, on motion or on its own, when a party abuses discovery and violates the rule's certification requirement. Although sanctions are arguably warranted, because both parties have demonstrated unreasonable behavior throughout the 11 discovery Motions (R. Docs. 204, 205, 210, 213, 237, 244, 252-256) resolved in this and the Court's previous Order (R. Doc. 278), the Court will not impose sanctions on either party at this time. But both sides are advised that sanctions will be imposed if future abuses of the discovery process occur. For now, the parties are reminded that:

> [I]n adversary proceedings, clients are litigants and though ill feeling may exist between clients, such ill feeling should not influence a lawyer's conduct, attitude, or demeanor towards opposing lawyers; that effective advocacy does not require antagonistic or obnoxious behavior . . . and that malfeasant counsel can expect that their conduct will prompt an appropriate response from the court.

*Orchestrate HR, Inc. v. Trombetta*, 178 F. Supp. 3d 476, 511–12 (N.D. Tex. 2016).

Doc. 252) are **DENIED as moot** as to **Request for Production No. 50**. As for the remaining Requests for Production, all of which relate to the negotiations and value of the eventual settlement in Ms. Robinson's wrongful death lawsuit, Plaintiffs' Motions to Compel (R. Doc. 252-256) are also **DENIED** for the reasons given below.

Plaintiffs point out that fraud may be proven by circumstantial evidence in Louisiana, La. Civ. C. art. 1957, and that circumstantial evidence may "includ[e] highly suspicious facts and circumstances," *Lomont v. Bennett*, 172 So. 3d 620, 629 (La. 2015). With that in mind, Plaintiffs suggest that "if the value of Ms. Robinson's settlement is greatly disproportionate to Khance Blackmon's settlement, that would be [] 'highly suspicious' . . . circumstantial evidence of the Defendants' fraud, since that would evidence the Defendants' awareness that a represented party was more likely to recover a reasonable settlement value, which therefore gave the Defendants reason to misrepresent the available coverages to the Blackmons and their Florida counsel to prevent them from being represented by counsel during settlement negotiations" (R. Doc. 252-1 at 9), and to "obtain a settlement far below what was reasonable" (R. Doc. 253-1 at 12). But Plaintiffs' argument misses the mark.

According to their Complaint, Defendants misrepresented the amount of available coverage to the Blackmons beginning in August of 2016, and again lied to Ted Blackmon's attorneys (Ward and Barnes) in February of 2017. Ms. Robinson's lawsuit did not reach a settlement until May of 2019. (R. Doc. 252-2). The actual amount of Ms. Robinson's settlement (or the negotiations and considerations that led to that amount) were unknown to Defendants at the time of the alleged misrepresentations to the Blackmons. Therefore, the information sought could not have been what motivated Defendants to allegedly misrepresent the amount of available coverage to the Blackmons in 2016 (or early 2017).

Finally, Plaintiffs have not shown that any settlements, jury verdicts, or other quantum research considered by Defendants in assessing the value of Ms. Robinson's lawsuit, after the case was filed but prior to settlement, fall within the scope of permissible discovery.[24] *See* Fed. R. Civ. P. 26(b)(1) advisory committee's notes (2015) ("A party claiming that a request is important to resolve the issues should be able to explain the ways in which the underlying information bears on the issues as that party understands them. The court's responsibility, using all the information provided by the parties, is to consider these and all the other factors in reaching a case-specific determination of the appropriate scope of discovery.").

Beyond that, the legal research and materials considered by the Insured Defendants and their counsel in negotiating the settlement of Ms. Robinson's Texas lawsuit are protected as work product.[25] *See U.S. ex rel. Pogue v. Diabetes Treatment Centers of Am.*, 2004 WL 2009413, at *5 (D.D.C. May 17, 2004) ("The notes, legal memoranda, [and] legal research . . . prepared or obtained by [counsel] related to the proposed settlement . . . [are] protected by the work product privilege, specifically, the opinion work product privilege as these documents reflect the mental impressions and legal evaluations of counsel."). And critical here, Plaintiffs have not shown any waiver has occurred.

---

[24] Plaintiffs additionally argue that any quantum research considered by Defendants in assessing the value of Ms. Robinson's wrongful death claim is relevant because that same quantum research would be just as relevant in assessing the value of Khance Blackmon's wrongful death claim, which arose out of the same accident. The Court addressed an identical argument in the preceding section of this Order, in connection with Plaintiffs' earlier Motion to Compel, which in part sought documents regarding the valuation of Ms. Robinson's claim. (R. Doc. 213). The Court found a narrow scope of information related to the valuation of Ms. Robinson's claim, created prior to her estate's lawsuit being filed, could potentially be discoverable if certain conditions were met. The documents at issue here, which were created or considered after Ms. Robinson's suit began, do not meet those conditions and are therefore beyond the scope of discovery. Moreover, the Court points out that Plaintiffs have not indicated which state's law was applied by the Texas court in Ms. Robinson's lawsuit. Therefore, Plaintiffs have not given the Court any reason to diverge from its prior holding.

[25] Defendants have also argued the documents are inadmissible and beyond the scope of discovery under Rule 408 of the Federal Rules of Evidence. The Court finds it unnecessary to consider this argument.

Plaintiffs' Motions to Compel (R. Docs. 252-256) are therefore **DENIED** as to the **Requests for Production** at issue.

### G.    Professional Liability and Errors and Omissions Claims

In their earlier Motion to Compel (R. Doc. 213-1 at 17), Plaintiffs sought the production of documents related to any professional liability or errors and omissions claims asserted by any of the Insured Defendants "related to claims handling of the collision or related to the Blackmons' claims." (R. Doc. 213-1 at 17) (Request for Production Nos. 32, 34). In response, the Insurer Defendants refused to produce any information, claiming that Plaintiffs were already in possession of this information, as the Insured Defendants had already responded to similar requests, indicating that they had not filed any of the referenced claims. Plaintiffs argue that they are still entitled to a response from the Insurer Defendants, even if their response is simply to confirm that no responsive documents exist. The Court agrees.

It would have saved both the parties and the Court time and resources had the Insurer Defendants just provided meaningful responses. Plaintiffs should not have had to compel this information from the Insurer Defendants. *Ft. Washington Res., Inc. v. Tannen*, 153 F.R.D. 78, 79 (E.D. Pa. 1994) ("It is not a bar to the discovery of relevant material that the same material may be in the possession of the requesting party . . . ."); *Federal Deposit Ins. Corp. v. Renda*, 126 F.R.D. 70, 72 (D. Kan. 1989) ("Even if the plaintiffs are in possession of certain documents which they requested from the defendants, the plaintiffs are entitled to review those documents which are in the defendants' control."). Plaintiffs' Motion to Compel (R. Doc. 213) is therefore **GRANTED** as to **Request for Production Nos. 32 and 34**. The Insurer Defendants must supplement their responses within **21 days** of this Order.

### H.    Personnel Files and Quality Assurance Audits

Plaintiffs move the Court to compel the Insurer Defendants to respond to Request for Production Nos. 10, 11, 37, and 38, which seek the entire personnel files of Anthony Ver Meer, Matt Willson, and Milena Ivanis, in addition to any other employees involved with the handling of the Blackmons' claims, as well as any quality assurance audits related to those employees. To begin, the key players in this case are Anthony Ver Meer and Matt Willson. With that in mind, and considering the highly sensitive nature of the information requested, the Court **DENIES** Plaintiffs' Motion to Compel to the extent Request for Production Nos. 10, 11, 37, and 38 seek information related to Milena Ivanis or any employee other than Anthony Ver Meer and Matt Willson.

As to Anthony Ver Meer and Matt Willson, the Court first notes that Plaintiffs' discovery requests are overly broad—they seek any information that might possibly relate to Ver Meer or Willson's employment going back 2 to 3 years before the accident. This would include social security numbers, W-2s, medical information, home addresses, etc. The Court finds no justifiable grounds for compelling the information requested. Instead, it will limit the information to any documents found in the personnel files of Ver Meer or Willson that reflect their training and job performance between January 1, 2015, and October 19, 2017, as well as any personnel actions related to the adjustment of the Blackmons' claims. Personnel actions would include any bonuses, reprimands, reassignments, reviews, terminations, promotions, or demotions that were given based on, or that otherwise refer to, Ver Meer or Willson's handling of the Blackmons' claims. *Estate of Haeuser v. Westchester Surplus Lines Ins. Co.*, 2015 WL 403632, at *1 (E.D. La. Jan. 29, 2015) (similarly limiting production of adjuster's personnel file).

Therefore, Plaintiffs' Motion to Compel (R. Doc. 213) is **partially GRANTED** as to **Request for Production Nos. 10, 11, 37, and 38**, consistent with the Court's **limitations**. The Insurer Defendants must **supplement** their responses **within 21 days** of this Order and any

personally identifying information (social security numbers, birthdays, etc.) must be **redacted** before production.

### I.    Employee Manuals and Compensation/Incentive Programs

Plaintiffs' earlier Motion to Compel (R. Doc. 213) asks the Insurer Defendants to produce "employee manuals, training manuals, claims handling policies and procedures, handbooks, employee compensation and incentive programs, reference materials, and other similar documents" at issue in Request for Production Nos. 14 and 31. (R. Doc. 213-1 at 49-50). Like its other requests, these again sweep too far. They are not limited in time or scope to the manuals and policies that would have applied to either Ver Meer or Willson at the time the Blackmons' claims were being adjusted. Moreover, Defendants object to production of this material as proprietary and suggest that a protective order would be required in order to produce any of the information requested.

The Court finds any claims handling manuals or policies or incentive programs that would have applied to Ver Meer or Willson during their adjustment of the Blackmons' claims from June 15, 2016, to October 19, 2017, are relevant and discoverable. Any other requested information is beyond the scope of permissible discovery, including the compensation, rewards, and similar information sought in Request for Production No. 14.

And so, Plaintiffs' Motion to Compel (R. Doc. 213) is **partially GRANTED** as to **Request for Production Nos. 14 and 31** to the extent Defendants must produce any claims handling manuals or policies, or incentive programs, that would have applied to Ver Meer or Willson between June 15, 2016, and October 19, 2017. The parties must **agree** to a **protective order** covering the production of these documents **within 14 days** of this Order. Defendants must then **supplement** their **responses** within **21 days** of this Order.

### J.        Document Retention Policies, IT Systems, and ESI

Plaintiffs' Request for Production Nos. 35 and 39 seek the following information from the

Insurer Defendants and are at issue in Plaintiffs' earlier Motion to Compel (R. Doc. 213):

**Request for Production No. 35**
Please provide copies of any and all documents relating to any of your policies and
procedures from January 1, 2013 through the present regarding or relating to the
following:
a)      Written document retention and/or destruction policies;
b)      Information technology ("IT"), information systems ("IS"), or management
         information systems ("MIS") handbooks, manuals, or guides;
c)      Notices of pending or anticipated litigation distributed to some or all of your
         officers or employees;
d)      Computer, network, and/or e-mail policies or protocols;
e)      Organizational charts;
f)      Library coding systems;
g)      Corporate glossary or glossaries;
h)      Document coding indexes;
i)      Sample or standard form confidentiality agreements with, or policies
         provided to, your employees and/or independent adjusters hired and/or
         otherwise retained by you; and
j)      Claims handling materials and manuals and documents regarding insurance
         laws and regulations in the states of Florida, Alabama, and Louisiana.

**Request for Production No. 39:**
Please provide copies of any and all operational manuals, coding manuals, software
description, or other written or electronic copies of all primers, training materials,
or other descriptions of protocols or other similar information or materials provided
by your IT personnel and/or the programmers and/or developers or others of any
software and all databases used by you for electronically stored information (ESI)
which may contain any information whatsoever regarding the instant matter, the
underlying collision, and/or any claims related thereto. Further provide the
following:
a) Provide copies of the job description and CV of any and all persons retained by
you within the last five years having provided IT or information support services
who may be knowledgeable or familiar with the specific software and its
specifications and/or has had access to any information related to the instant matter,
the collision, and/or any claims related thereto, which is stored or maintained as
ESI;
b) Provide copies of the job description and CV of any and all persons retained by
you within the last three years who have accessed the claims file(s) or any related
information concerning the instant matter, the collision, and/or any claims related
thereto, via your ESI systems, including or relating to any adjuster notations, call
logs, event logs, or information of any other type;

c) Provide copies of any and all available information from your IT and ESI systems which show data entries and accesses by or on behalf of Anthony Ver Meer, Matt Willson, and/or Milena Ivanis into any Insurers' ESI systems relating to the instant matter, the collision, and/or any lawsuits or claims related thereto, and provide the date, time, and substance of any and all changes or modifications to such ESI or any additions or notations made in the same; and

d) Provide copies of any and all available information from your IT and ESI systems which show data entries and accesses by any and all persons other than Anthony Ver Meer, Matt Willson, and/or Milena Ivanis into any Insurers' ESI systems relating to the instant matter, the collision, and/or any lawsuits or claims related thereto, and provide the date, time, and substance of any and all changes or modifications to such ESI or any additions or notations made in the same.

(R. Doc. 213-1 at 52-53); (R. Doc. 213-2 at 104-105). According to Plaintiffs, they are "entitled to investigate who had access to the system and who may have had the ability to make entries or changes to the information . . . ." (R. Doc 213-1 at 55).

The Insurer Defendants responded to the Motion to Compel by producing the Declaration of Daniel P. Kulakofsky, which indicates that compliance with Request for Production No. 35 alone, which is not limited to this lawsuit or the accident at issue, would "require the collection and review of more than 1,000,000 pages of information at a cost of more than $925,000." (R. Doc. 228-4 at 5). As for Request for Production No. 39, Mr. Kulakofsky estimates that even if the Request were limited to Traveler's 3 critical IT systems, which it is not, "the collection effort to gather [just] the requested technical manuals would take more than 250 hours." (R. Doc. 228-4 at 7). Beyond that, "system access logs are only retained for 90 days and provide no information regarding actions taken by the person accessing the system" and the "system prevents modifications of deletions of information placed into the claim file(s) by Anthony Ver Meer, Matt Willson or Milena Ivanis more than 24 hours after the information is added. . . ." (R. Doc. 228-4 at 7-8) (for that reason, obtaining the information sought would require the hiring of an outside forensic lab).

Plaintiffs' stated purpose for the Requests is to determine who accessed the system and if any modifications were made to the claim files. But Defendants have expressly stated that the system only retains access information for 90 days and that it becomes impossible to modify or delete information from the claim files after 24 hours. Beyond that, the Requests are overly broad. Request for Production No. 35 is not even limited to the claims at issue, or even the location where the claims were adjusted, requiring the substantial production of irrelevant information. The Court does not consider these Requests in a vacuum. Instead, like the entirety of Plaintiffs' discovery requests, these go too far.[26]

Given the excessive amount of information requested and the burden of compliance demonstrated by Defendants, the Court will not compel Defendants to respond further. *See Panel Specialists, Inc. v. Tenawa Haven Processing, LLC*, 2017 WL 3503354, at *3 (D. Kan. Aug. 16, 2017) ("PSI has adequately explained and supported its contention concerning the burden of producing the requested information. This explanation coupled with the minimal probative value of the requested material suggests that Tenawa's request is not proportional. Tenawa's motion to compel is denied.").

And because Plaintiffs offer "no metric by which to limit the universe" of requested information, *Prusin v. Canton's Pearls, LLC*, 2017 WL 1166326, at *2 (D. Md. March 28, 2017) (denying request for production of excessive ESI), Plaintiffs' Motion to Compel (R. Doc. 213) is **DENIED** as to **Request for Production Nos. 35 and 39.**

---

[26] *See U.S. Equal Employment Opportunity Comm'n v. George Washington Univ.*, 2020 WL 3489478, at *7 (D.D.C. June 26, 2020) ("EEOC has thus weakened its position on this factor by insisting on such obviously overbroad discovery because, as written, the RFPs are not designed to capture relevant, unique information; rather, they are designed to capture great swaths of information without regard to whether that information is likely relevant and unique. That is, although EEOC's asserted reasons for seeking emails . . . are undoubtedly germane to this case, its manner of doing so—through promulgation of overbroad requests for electronically-stored information (ESI)—dilutes the importance of the discovery that would be gained from these RFPs (if enforced as written).").

### K.    Joint Defense Agreement

Throughout their privilege log, the Insurer Defendants claim a "joint defense privilege" in addition to the attorney-client privilege or work product privilege for any documents or communications shared between the various insurers or between the insurers and their insureds, including. (R. Doc. 213-3). "The joint defense privilege, also known as the 'common interest' doctrine, is not an independent privilege, but is instead an extension of the attorney-client privilege" or work product doctrine. *Shaw Group, Inc. v. Zurich Am. Ins. Co.*, 2014 WL 1784051, at *14 n.20 (M.D. La. May 5, 2014); *Miller v. Gorski Wladyslaw Estate*, 2007 WL 9734153, at *2 (W.D. La. Feb. 19, 2007) ("The common interest rule applies equally as an extension of both the attorney-client privilege and the work product doctrine."). To test this privilege going forward,[27] Plaintiffs have requested production of the agreement itself.

The Insurer Defendants, however, oppose the production by claiming the document is subject to the attorney-client privilege and contains attorney work product. Based on the information before the Court, it is unable to determine the existence of any privileges with respect to the document. For that reason, and because the privilege may again be asserted in the future, the Court will **ORDER** the Insurer Defendants to file the document **under seal** for **in-camera** review **within 7 days** of this Order. Following the Court's review, it will issue a subsequent determination as to discoverability.

### L.    Request for Admission No. 16

In their earlier Motion to Compel (R. Doc. 213-1 at 55), Plaintiffs ask the Court to compel the Insurer Defendants' complete response to Request for Admission No. 16:

---

[27] Because the Court previously found the Insurer Defendants failed to substantiate their claims that both the attorney-client privilege and work product doctrine protected their claim files from disclosure, it was unnecessary to consider the common interest privilege in connection with this Order. *See Shaw Group, Inc.*, 2014 WL 1784051, at *14 n.20 (common interest is not an independent privilege).

**Request for Admission No. 16:**
Admit or deny that you (through attorney Seth Schmeeckle and/or other representatives) contacted Plaintiffs' former attorney Mr. Austin Ward, on or about March 2, 2018, and were advised by Mr. Ward that claims adjuster Anthony Ver Meer had informed him during a February 2017 telephone conversation, that there was only $1,000,000.00 in available insurance coverage, and that there were no excess coverages or other insurance available or covering the claims of Ted Blackmon and/or the Estate of Khance Blackmon.

(R. Doc. 213-2 at 125). The Insurer Defendants objected to this Request "on the grounds that attorney Seth Schmeeckle' s interview of Austin Ward, a potential witness to the case, constitutes privileged attorney work-product and is not subject to discovery." (Resp. to Request for Admission No. 16, R. Doc. 213-2 at 125). The Court agrees; for this and other reasons, Plaintiffs' Motion to Compel (R. Doc. 213) is **DENIED** as to **Request for Admission No. 16**.

First, the purpose of a request for admission is to identify facts that are not at issue for trial. *Superior Sales West, Inc. v. Gonzalez*, 335 F.R.D. 98, 105 (W.D. Tex. 2020) ("The purpose of requests for admissions is to eliminate from the trial matters as to which there is no genuine dispute. Therefore, requests for admissions are not principally discovery devices."). Whether Anthony Ver Meer lied about the amount of available coverage to Austin Ward in February of 2017 is a fact at issue in this case. But what Austin Ward later said to defense counsel during a witness interview is not. This is not an appropriate use of a request for admission, and the Court will not compel any further response.

Moreover, the request is not really directed at a party. In reality, this request for admission is directed at defense counsel, Seth Schmeeckle, which is not appropriate. And finally, a witness' statement taken by an attorney in preparation for trial is generally protected as work product. *S.E.C. v. Brady*, 238 F.R.D. 429, 441 (S.D. Tex. 2006). Austin Ward will be deposed during discovery. Plaintiffs may ask him about any conversations he had with Anthony Ver Meer during his

deposition. Therefore, Plaintiffs' Motion to Compel (R. Doc. 213) is **DENIED** as to **Request for Admission No. 16**.

###### M.    Remaining Requests for Admission

In their later Motions to Compel (R. Docs. 252-256), Plaintiffs ask the Court to determine the sufficiency of the various Defendants' responses to their Requests for Admission or to otherwise deem them admitted. In the Requests at issue, Plaintiffs ask the various Defendants to admit that they would not contest certain statements made in earlier Court filings—e.g., motions and declarations. Defendants denied the requests as written and otherwise admitted to the extent they felt it was appropriate. "[B]y responding subject to its objections, including clearly denying some of the requests, while admitting part and qualifying or denying the rest of others, all with adequate explanations, defendant[s] ha[ve] responded in the manner expressly contemplated by [Rule] 36(a)(4)." *St. Bernard Par. v. Lafarge N. Am., Inc*., 2016 WL 1660174, at *1 (E.D. La. Apr. 27, 2016). And so, no further response is required and Plaintiffs' Motions to Compel (R. Docs. 252-256) are **DENIED** as to the **Requests for Admission** at issue.

## IV.    CONCLUSION

For the reasons given above, the Court resolves the 8 discovery-related Motions (R. Docs. 213, 237, 244, 252-256), as follows:

- Plaintiffs' Motion to Compel (R. Doc. 213) is **GRANTED in part** and **otherwise DENIED**.

- Plaintiffs' Motion for Leave to Propound Additional Interrogatories (R. Doc. 237) is **DENIED**.

- The Insurer Defendants' Motion for Protective Order (R. Doc. 244) is **DENIED**.

- Plaintiffs' Motions to Compel (R. Docs. 252-256) are **DENIED**.

- Plaintiffs' request for attorney's fees and costs in connection with any of its Motions to Compel (R. Docs. 213, 252-256) are likewise **DENIED**, given the resolution of its Motions and the behavior of both sides, as noted above and in the Court's prior Order (R. Doc. 279). *See* Fed. R. Civ. P. 37(a)(5)(B) and (C). Each party will bear its own costs associated with these Motions. *See Southern Filter Media, LLC v. Halter*, 2014 WL 4278788, at *9 (M.D. La. Aug. 29, 2014) (declining to award costs where motion to compel was partially granted and partially denied).

Signed in Baton Rouge, Louisiana, on November 16, 2020.

_____

**SCOTT D. JOHNSON**
**UNITED STATES MAGISTRATE JUDGE**